## SIMMONS v. ATLANTIC GREYHOUND CORPORATION.

### Civil Action No. 315.

District Court, W. D. Virginia, at Roanoke.

Dec. 30, 1947.

George P. Lawrence, of Roanoke, Va., and Hill, Martin & Robinson, of Richmond, Va., for plaintiff.

Woods, Rogers, Muse & Walker, of Roanoke, Va., for defendant.

PAUL, District Judge.

### The Facts.

The plaintiff is a member of the Negro race and resides in the city of Roanoke, Virginia, where he is the minister of a church. He had occasion in October, 1946, to attend the annual Synod of his church which convened in Salisbury, in the State of North Carolina, and contemplated traveling to Salisbury and returning therefrom by means of the motor bus line which is operated by defendant as a common carrier of passengers. Accordingly on October 16, 1946, the plaintiff purchased at the defendant's bus station at Roanoke a round-trip ticket from Roanoke, Virginia, to Salisbury, North Carolina, by way of Winston-Salem, North Carolina. At the latter point a change to another bus was necessary to complete the trip to Salisbury.

After purchasing his ticket the plaintiff proceeded to the bus which was waiting in the station. He handed his ticket to the bus operator who was stationed at or near the entrance door to the bus and the latter detached that portion of the ticket covering the ride to Winston-Salem. This was some minutes before the scheduled time for the departure of the bus and there were only about three other passengers on the bus at that time. On entering the bus the plaintiff took a seat which was in the forward part of the bus and about four seats back from the front. After a few moments the bus operator noticed where the plaintiff had seated himself and requested him to move to the rear of the bus. The plaintiff did not move as requested and a brief conversation ensued, the exact language of which is not clear and is not important. The substance of it was that the plaintiff inquired whether there was any law which required him to change his seat and the bus driver replied that his instructions were

to seat colored persons in the rear of the bus, and that plaintiff would have to move back or else leave the bus. The plaintiff then said he would go into the office and see about the matter and, after receiving from the operator the portion of the ticket which the latter had previously taken up, the plaintiff left the bus. In the complaint it is alleged that the operator addressed plaintiff in a loud, rude and threatening manner; but the weight of the evidence is to the contrary and is to the effect that in addressing the plaintiff the operator was courteous and spoke in a normal conversational tone.

On leaving the bus the plaintiff re-entered the office of the bus terminal and inquired for the manager. Mr. J. W. Saunders, Supervisor of defendant's lines in the area centering in Roanoke, was in the office at the time and asked plaintiff what he might do for him. The plaintiff, after relating to Mr. Saunders the incident on the bus, stated that he was an interstate passenger and that he understood the action of the bus operator was contrary to "the Supreme Court law." Mr. Saunders, without entering into any legal discussion, explained that the defendant company, in its tariffs filed with the Interstate Commerce Commission, reserved the right to control the seating of passengers and that the bus operator had merely been carrying out the rules of the company. He offered to show the plaintiff a copy of the tariff which was posted at the ticket office, and also offered plaintiff a refund of the purchase price of his ticket. The plaintiff did not accept either offer and, after a few moments, left the terminal without making any further effort to re-board the bus, which was still waiting its scheduled time of departure. It is clear that plaintiff was not evicted from the bus or deterred from returning to it by any form of physical force or threats. He simply chose not to travel by bus rather than submit to the defendant's rule that colored persons be seated in the rear of the bus. It is not disputed that this was the only reason for the operator's request.

The plaintiff charges that, due to the action of the defendant, he was forced to travel to Salisbury by train, resulting in an uncomfortable trip, extra expense, and in a delay which caused him to miss the meeting of some committee of which he was a member. It is clear that the plaintiff, had he chosen to submit to the rule as to the seating of passengers, could have made his trip on the bus and avoided any of these consequences of traveling by train. It is equally clear that what the plaintiff seeks by this action is to establish a right to be free of any compulsion in regard to his choice of a seat on defendant's bus where that compulsion is based solely on the plaintiff's race.

At the conclusion of the evidence the defendant submitted a motion for a directed verdict in its favor upon grounds fully stated in the record. The court, not then being prepared to pass upon the legal questions presented by this motion, took it under consideration and reserved its action thereon. The court then, with the agreement of counsel for both parties, submitted the case to the jury for a special verdict limited solely to the amount of damages; it being understood and agreed that the special verdict should be received subject to later determination by the court of the legal questions raised by the motion for a directed verdict. The jury was accordingly instructed that, on the assumption that the plaintiff's rights had been violated and that he was entitled to recover, the jury should determine only the amount of damages. The jury assessed the damages at $25. The defendant then moved that the verdict be set aside and that final judgment be entered for defendant in accordance with its motion for a directed verdict and upon the same grounds. It is this motion which is now before the court.

### Discussion.

The complaint in this case, even after amendment, is indefinite and uncertain in stating the basis or ground upon which plaintiff rests his contention that his rights have been violated or what the rights are for the violation of which he seeks redress. The allegations which may be deemed as touching this matter are found in several paragraphs of the complaint, as follows:

Par. 1. "Jurisdiction is founded on the existence of a Federal question and the

amount in controversy. The action arises under the Constitution and Laws of the United States and particularly the Fourteenth Amendment, Section 1; the Constitution of the United States, Revised Statute 1979, 17 Stat. 13, and Title 8 U.S.C.A., Section 43."

Par. 12. "It is also alleged that the defendant unlawfully evicted the plaintiff from said bus solely because the plaintiff herein is a Negro and because the statutes of the Commonwealth of Virginia and a regulation of said defendant, hereinafter set forth and made a part hereof, provide for segregation of Negroes when traveling on motor vehicle buses."

Par. 14. "It is further alleged that the regulation of the defendant provides, as will be seen below, for the separation and segregation of Negro and White passengers regardless of their status whether interstate or intrastate passengers in contravention of the laws of the United States of America.

Par. 17. "The defendant acting under color of a statute, regulation, custom or usage, gave unlawful orders to plaintiff traveling in interstate commerce to the deprivation of his rights, privileges or immunities secured by the Constitution and laws of the United States of America thereby causing plaintiff to be damaged in the sum of $20,000.00".

It is clear that this is not a case based upon any alleged violent or abusive treatment of a passenger by the agent or employee of a common carrier such as would constitute a tort under the common law. The complaint is not grounded upon any such theory and there is no evidence of anything of the sort. Neither is it a case based upon alleged discrimination or inequality of treatment in the accommodations offered to the plaintiff, such as was involved in the case of Mitchell v. United States, 313 U.S. 80, 61 S.Ct. 873, 85 L.Ed. 1201, and in the more recent case of Henderson v. United States, 63 F.Supp. 906, from the Maryland District of this Circuit. It is true that in the questioning of some of the witnesses during the trial it was suggested that the seats in the rear of the bus were less comfortable and conven-

ient than those in the forward portion, but there was no evidence to support such a contention and the matter was not pursued. Nor does the complaint make any such charge.

From the allegations of the complaint, hereinbefore quoted, it will be seen that paragraph 1 sounds on those provisions of the Fourteenth Amendment to the Constitution safeguarding the privileges or immunities of citizens of the United States against abridgement by any state and on the statute commonly referred to as the "Civil Rights Act" giving a right of action for the deprivation of any of the rights, privileges and immunities secured by the Constitution; while paragraph 14 by implication seems to invoke the constitutional provisions relating to the regulation of interstate commerce; and paragraph 17 appears to be a combination of both.

However, it is clear that, under the decisions interpreting the purpose and scope of the Fourteenth Amendment, no cause of action is here alleged or shown involving violation of that Amendment or of the Civil Rights Act. The Supreme Court has consistently held that there is no infraction of the Fourteenth Amendment by a requirement for separate accommodations for white and colored persons on public carriers so long as the accommodations are equal. See Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256; and McCabe v. Atchison, T. & S. F. Ry. Co., 235 U.S. 151, 160, 35 S.Ct. 69, 59 L.Ed. 169.

I think it apparent that this case has its inspiration in the decision in the case of Morgan v. State of Virginia, 328 U.S. 373, 66 S.Ct. 1050, 90 L.Ed. 1317, 165 A.L.R. 574, which rested on considerations relating to interstate commerce and in which a state statute requiring the segregation of white and colored passengers on motor vehicle carriers was held, when applied to interstate passengers, to be invalid as constituting a burden upon and interference with interstate commerce. What the plaintiff is apparently seeking in this action is to extend to the facts of the present case what he believes to be the principles laid down in the Morgan case.

The Morgan case rested solely on the commerce clause of the Constitution; it involved no consideration whatever of the Fourteenth Amendment or of the Civil Rights Act. There is nothing in it which overrules, or even discusses, the principles laid down in Plessy v. Ferguson, supra, and in McCabe v. Atchison, T. & S. F. Ry. Co., supra, and these cases are, I take it, still authority for what was decided in them. The result is that the plaintiff has not alleged or shown any violation of the "rights, privileges or immunities" protected by the Fourteenth Amendment, and if the action can be maintained it can be only by invoking the commerce clause of the Constitution, Article 1, § 8.

By the Motor Carrier Act of 1935, 49 Stat. 543, 49 U.S.C.A. § 301 et seq., the regulation of motor carriers engaged in interstate commerce was vested in the Interstate Commerce Commission. By section 216(a) of the act, 49 U.S.C.A. § 316(a), it is made the duty of such carriers to "establish * * * just and reasonable regulations and practices" relating to rates, fares and charges, and to the issuance and form of tickets, the carrying of baggage, the facilities for transportation, "and all other matters relating to or connected with the transportation of passengers in interstate or foreign commerce." Under Section 217(a) of the act, 49 U.S.C.A. § 317 (a), carriers are required to file with the Commission and to keep open to public inspection "tariffs showing all the rates, fares, and charges for transportation, and all services in connection therewith, of passengers or property * * *."

On October 16, 1946, and prior thereto the defendant and its connecting carriers had on file with the Interstate Commerce Commission their tariffs covering, among others, its operations between Roanoke, Va., and Salisbury, N. C., and which included under the heading *"Reservations"* the following:

"(2) The carriers reserve to themselves full control and discretion as to seating of passengers and reserve the right to change such seating at any time during the trip."

Under date of August 15, 1946, the defendant issued to all of its bus drivers in writing certain instructions as to rules and practices to be observed in the seating of passengers; this being in the following language:

"Atlantic Greyhound Corporation
"1100 Kanawha Valley Building
"Charleston, West Virginia
"August 15, 1946
"To:       All Drivers
"Subject:  *Seating of Passengers in Coaches*

"As a common carrier of passengers this company is under a duty to operate its coaches in such manner as will promote the comfort, security and safety of all of its passengers, and will preserve the public peace and good order on its coaches.

"This company several years ago adopted a rule concerning the seating of passengers which reads as follows:

" 'The carriers reserve to themselves full control and discretion as to seating of passengers and reserve the right to change such seating at any time during the trip.'

"This rule is published in the present effective tariffs of the company and in its timetables, printed notices to the public, and is on file with the Interstate Commerce Commission, as required by law, and has the force and effect of law, and as such is binding upon both the company and its passengers. This rule was required because of the many well known factual situations which arise out of the presence upon the coaches of intoxicated persons whose conduct becomes objectionable to others, the illness of passengers, particularly children, while enroute, differences in the attire or cleanliness of passengers, and the established usages, customs and traditions of the people in the various states and areas served by the company. In some states which we serve, it is the established usage, custom and tradition induced by the general sentiment of the community that passengers of different races be not seated in adjoining seats or in the same part of a public conveyance. In many states this custom, usage and tradition has been embodied in statute or ordinance.

"Where such has been the accepted usage, custom and tradition, it is suggested that, as far as practicable and pursuant to the authority of the rule above quoted, colored passengers be seated from the rear for-

ward, and white passengers from the front toward the rear. This rule is based upon established usage induced by general sentiment of the community, and is designed not only to promote the comfort, safety and security of all the passengers, but to preserve peace and good order and avoid undue discrimination. This will also serve the purpose of accomplishing uniformity, and will avoid requiring passengers from repeatedly shifting seats to meet the seating requirements of a changing passenger group.

"It is essential in any assignment of seats that there be no undue discrimination of any kind shown against any passenger, whether colored or white, and that all be given seats which are substantially equal, in comfort and convenience to other available seats in the coach. This is a requirement of the law and of good common sense, and must be strictly followed.

"The successful accomplishment of this duty of the company to assure the comfort, security, and safety of its passengers and to preserve the public peace and good order, depends primarily upon the courtesy, tact, and common sense used by its coach operators in handling situations which may require an assignment of seats. The use of consideration, politeness and good judgment is essential in every such case, and will preserve to the company and its employees the good will of its passengers and their continued friendship. All passengers should be shown the same degree of courteous and considerate treatment. If any passenger proves reluctant to comply with the seat assignment, he should be shown the Company's rule and your instructions under the rule, and the reasons for them should be explained to him.

"Should a passenger refuse to comply with your seating assignment you must not use force. If, after every persuasive method has failed and the passenger still refuses to comply and has been courteously advised of our rules and regulations, and that you will have to obtain the assistance of a law enforcement officer, you may then call for and appeal to a police or law enforcement officer and have such passenger removed from the bus. Under the law a peace officer does not need a warrant to arrest a per-

son who has committed a misdemeanor in his presence. Therefore, in the event you find it necessary to seek the assistance of a peace officer, you should repeat your request in the presence and hearing of this officer, and then leave the matter of enforcement to him. Passengers should not be removed from the bus except at points where we maintain depots, where they will be safe and protected.

"When any passenger is removed you are instructed to make no cash refund for the unused portion of his ticket. You should, however, whenever practicable have the local ticket agent reissue the passenger's ticket for the unused portion. If no ticket agent is available, you should endorse in your handwriting on the ticket the points between which the ticket has been used, sign your name and number, so that the passenger may obtain a refund from the nearest ticket agent for the unused portion, or may resume his journey on another coach.

"It has been our general experience that a genuinely courteous and considerate coach operator will have very little difficulty in the proper seating of passengers. If you are not courteous, tactful and considerate, and have a chip on your shoulder, the problem may then become difficult.

"In the event of any complaint on your coach concerning the matter of seating passengers, you will promptly make out one of our regular "Observation" reports, in which you will outline the essential facts involved and list the names and addresses of witnesses.

"We ask your cooperation and compliance.

"George S. Engle
"Executive Vice-President
& General Mgr."

Whether the defendant had at any time prior to August 16, 1946, issued to its bus operators any formal and comprehensive instructions as to the seating of passengers is not made clear from the evidence, and it is not of importance from the standpoint of this case whether it had done so or not. So far as concerns the separation of white and colored passengers, they were under the compulsion of the Virginia Statute, Code

1942, §§ 4097z to 4097dd, with which they were undoubtedly familiar. This statute was struck down in the Morgan case only so far as it applied to interstate passengers. In this situation the defendant apparently thought it advisable and necessary to make clear its policy and practice by the issuance of the formal instructions heretofore quoted.

These rules, as stated therein, purported to be issued pursuant to the provisions of the tariffs filed with the Interstate Commerce Commission in which the carrier had reserved the right to control the seating of passengers. The reason for the promulgation of the instructions, as testified by the President of the defendant company, was that confusion existed in the minds of the public and particularly among many Negroes as to the effect of the decision in the Morgan case, and that it was thought desirable and necessary to promulgate rules for uniform application setting forth the policy of the defendant as to the seating of passengers in order that the public might be guided thereby and the bus drivers instructed as to their duties and responsibilities in respect thereto. It appears that other motor carriers operating in adjoining states, where segregation of the races had been customary or imposed by statute, adopted rules substantially in the form of those of the defendant. It was in pursuance of the instructions heretofore quoted that the bus driver acted in this case.

■ There is no question that the power of regulating interstate commerce rests exclusively in Congress. It is also evident, as has been repeatedly noted by the courts, that this power is one which Congress has not seen fit to exercise to its permissible limits; that because it was thought unwise or unnecessary to do so Congress has not undertaken the specific regulation of all matters which may affect interstate commerce. In this situation the courts have frequently been called upon to consider matters relating to interstate commerce as to which Congress has not undertaken to legislate. This has led to the series of cases involving various state statutes affecting commerce in which, in the absence of Congressional legislation on the subject, the courts have exercised the power to deter-

mine whether the state enactments are invalid as constituting an encroachment on the power entrusted to Congress, and in which the courts have in many cases invalidated state statutes as constituting a burden upon interstate commerce. While acceptance of this judicial power has not been without question, as witnessed by the dissenting opinions in such cases as Adams Mfg. Co. v. Storen, 304 U.S. 307, 316, 58 S. Ct. 913, 82 L.Ed. 1365, 117 A.L.R. 429; McCarroll v. Dixie Greyhound Lines, 309 U.S. 176, 183, 60 S.Ct. 504, 84 L.Ed. 683; Southern Pacific Co. v. State of Arizona, 325 U.S. 761, 784, 65 S.Ct. 1515, 89 L.Ed. 1915, the authority of the courts in this respect must now be taken as settled.

It was in the exercise of this power that the Supreme Court acted in the case of Morgan v. Virginia, heretofore referred to. That case involved a Virginia statute which required that motor carriers should separate white and colored passengers and required that all passengers should observe and obey the directions of the agent of the carrier in respect to such separation. Failure of either the carrier or of a passenger in the performance of the respective duties imposed on them, was made a criminal offense. The conviction of a passenger in a criminal proceeding in the state court for refusal to occupy a seat reserved for colored persons was reversed on the ground that the statute, as applied to a passenger traveling interstate, was invalid as constituting a burden upon interstate commerce.

As previously stated, the plaintiff seeks here to extend to the facts of this case what he conceives to have been the principles laid down in the Morgan case. And unless the decision in that case furnishes a foundation for this action, the action cannot be maintained.

In considering the effect of the decision in the Morgan case there must be taken into account the principles upon which it rests and the cases which furnished precedent for it. Among these is the case of Hall v. DeCuir, 95 U.S. 485, 24 L.Ed. 547, which is specifically cited in the Morgan case as a foundation for the holding in the latter case. In the DeCuir case a statute of the State of Louisiana forbade any discrimination between or separation of pas-

sengers on public carriers on account of race or color. A public carrier engaged in interstate traffic by steamboat, in pursuance of a custom and rule adopted by the carrier, required that white and colored persons occupy separate accommodations. It enforced this rule against a colored passenger in Louisiana, with the result that the passenger invoked the state statute as the basis for a successful suit for damages against the carrier. The Supreme Court reversed the judgment on the ground that the state statute was a regulation of inter-state commerce and as such was unconstitutional.

The DeCuir case and the Morgan case involve the validity of statutes of directly opposite effect. In the former the state enactment forbade the separation of the races and in the Morgan case it required it. But both statutes were stricken down for the same reason, namely, that they constituted an interference with or burden upon interstate commerce, the regulation of which was exclusively in Congress. The cases are, of course, not inconsistent. On the contrary the older case is the authority for the later one. The most that they hold, as I understand them, is this: That the power to regulate interstate commerce rests exclusively in Congress, even though it be true that Congress has not exercised this power to its full extent and has refrained from enacting legislation dealing with certain aspects of such commerce; and that any state legislation which attempts to regulate interstate commerce, or which interferes with or burdens it, is invalid as an encroachment upon the power entrusted to Congress, even though it be' within a field which Congress has not sought to regulate by specific legislation.

In the DeCuir case, 95 U.S. at page 490, 24 L.Ed. 547, the court, in speaking of the exclusive power of Congress to regulate commerce between the states, says:

"This power of regulation may be exercised without legislation as well as with it. By refraining from action, Congress, in effect, adopts as its own regulations those which the common law or the civil law, where that prevails, has provided for the government of such business and those which the States, in the regulation of their domestic concerns, having established affecting commerce, but not regulating it within the meaning of the Constitution. In fact, congressional legislation is only necessary to cure defects in existing laws, as they are discovered, and to adapt such laws to new developments of trade. As was said by Mr. Justice Field, speaking for the court in Welton v. State of Missouri, 91 U.S. 275, 282, 23 L.Ed. 347, 'inaction (by Congress) * * * is equivalent to a declaration that inter-state commerce shall remain free and untrammelled.' Applying that principle to the circumstances of this case, congressional inaction left Benson at liberty to adopt such reasonable rules and regulations for the disposition of passengers upon his boat, while pursuing her voyage within Louisiana or without, as seemed to him most for the interest of all concerned."

The plaintiff appears to understand the decision in the Morgan case as being a judicial determination that any attempted separation of white and colored persons on a public carrier is illegal as applied to an interstate passenger, no matter by what authority or under what circumstances the attempt is made. I do not so construe it. I do not understand that the court in that case, or in the DeCuir case, asserted or assumed the power to impose regulations governing interstate traffic, but only that it denied the right of a state to interfere with such commerce. The distinction becomes important when, as in the instant case, we are dealing, not with a state statute but with the effect of a custom or rule adopted by the carrier in connection with the operation of its business. The difference in legal effect between a state statute attempting to regulate interstate commerce and a custom or regulation adopted by a carrier in the operation of its business is made clear not only in the language (heretofore quoted) of the DeCuir case but in other pertinent expressions of the Supreme Court—noticeably in the case of Chiles v. Chesapeake & Ohio Ry. Co., 218 U.S. 71, 30 S.Ct. 667, 54 L.Ed. 936, 20 Ann.Cas. 980.

Chiles v. Chesapeake & Ohio Ry. Co., supra, was a case in which a colored passenger, having reached the State of Ken-

tucky in the course of an interstate trip from Washington, D. C., over the lines of the defendant company, was requested by the train conductor to remove himself from a portion of the car reserved for white persons where he had seated himself and to occupy a seat in the space reserved for colored passengers. In making the request the conductor acted in pursuance to a rule of the carrier providing for the separation of white and colored passengers. After asserting his status as an interstate passenger and his supposed rights growing out of such status, the passenger reluctantly and under protest went to the coach reserved for persons of his race. The facts are substantially identical with those before this court with the exception that in the instant case the carrier was a motor bus instead of a railroad and that here the passenger left the bus rather than comply with the carrier's rule.

In that case (Chiles v. Chesapeake & O. Ry. Co., 218 U.S. at page 75, 30 S.Ct. at page 668, 54 L.Ed. 936, 20 Ann.Cas. 980) the court in discussing plaintiff's rights as an interstate passenger, said:

"And we must keep in mind that we are not dealing with the law of a state attempting a regulation of interstate commerce beyond its power to make. We are dealing with the act of a private person, to wit, the railroad company; and the distinction between state and interstate commerce we think is unimportant."

Thereafter the opinion of the court cites the case of Hall v. DeCuir and, after quoting from the opinion in that case substantially the same language which I have hereinbefore quoted, continues:

"This language is pertinent to the case at bar, and demonstrates that the contention of the plaintiff in error is untenable. In other words, demonstrates that the interstate commerce clause of the Constitution does not constrain the action of carriers, but, on the contrary, leaves them to adopt rules and regulations for the government of their business, free from any interference except by Congress. Such rules and regulations, or course, must be reasonable, but whether they be such cannot depend upon a passenger being state or interstate. This also is manifest from the

cited case. There, as we have seen, an interstate colored passenger was excluded from the privileges of the cabin set apart for white persons by a regulation of the carrier, and where the colored passenger's right to be was attempted to be provided by a state statute. The statute was declared invalid, because it attempted to force a carrier to do the very thing which plaintiff in error complains was not done in the case at bar; to wit, permit him to ride in the place set apart for white passengers. In other words, the statute was struck down, because it interfered with the regulations of the carrier as to interstate passengers."

In upholding the reasonableness of the carrier's rule for the separation of passengers, the court indicated that the test was "the established usages, customs, and traditions of the people" and the "promotion of their comfort and the preservation of the public peace and good order," and said that "Regulations which are induced by the general sentiment of the community for whom they are made and upon whom they operate, cannot be said to be unreasonable."

■ The right of a common carrier to adopt and enforce reasonable regulations governing the operations of its business has always existed. As already pointed out, the Motor Carrier Act, by which the regulation of motor carriers was entrusted to the Interstate Commerce Commission, makes it the duty of the carrier to establish such regulations, 49 U.S.C.A. § 316(a). This carrier in its tariffs filed with the Commission specifically reserved the right to exercise control of the seating of passengers. The granting of the right to operate was an approval of the right which the carrier reserved. It is true that the reservation made in the tariffs does not attempt to enumerate the various conditions or situations under which the right reserved might be exercised; nor does it appear that the right to seat passengers on the basis of racial origin has ever been specifically approved by the Commission. But the point is that neither Congress which has the power to regulate interstate commerce, nor the Commission to which Congress has delegated this power in part, has attempted any regulation or control of the carrier's rights

in this respect. This inaction, as stated in the DeCuir case, left the carrier "at liberty to adopt such reasonable rules and regulations for the disposition of passengers * * * as seemed to him most for the interest of all concerned."

The case of Chiles v. Chesapeake & O. Ry. Co., heretofore referred to and in which this same question was presented, has not, so far as I can find, been overruled up until now. I find nothing in the Morgan case to that effect, for the latter dealt only with a state statute and by implication at least (through a foot-note to the opinion) drew a distinction between the effect of such a statute and a rule of the carrier. In the Chiles case the rule of the carrier separating white and colored passengers was held not to be an unreasonable one, as founded on the established customs and traditions of the people and the preservation of the public peace and good order.

It is argued that the defendant is merely attempting to accomplish by a rule of its own the same result which the State of Virginia sought to accomplish by statute; and that the defendant cannot, by a company rule, do something which the state could not lawfully do. This argument misses the point. It assumes that the separation of passengers on racial grounds has been held to be unlawful under any circumstances. And it fails to recognize the distinction between the action of a state in attempting to regulate the business of a carrier in respect to matters which are the sole concern of Congress, and the right of the carrier to operate its own business subject to such regulations as Congress may impose. There are many aspects of interstate transportation which Congress, though possessing the power to do so, has not seen fit to regulate, but has left subject to the rules and practices of those engaged in the business. But the fact that Congress has refrained from acting in a field exclusively entrusted to it gives no right to a state to enter this field. This I understand to be the principle underlying both the DeCuir and the Morgan cases.

It may be conceded that rules adopted by carriers must be reasonable ones. Chiles v. Chesapeake & O. Ry. Co., 218 U.S. at page 76, 30 S.Ct. at page 667, 54 L.Ed. 936, 20 Ann.Cas. 980. In the instant case the journey which the plaintiff proposed to take was between two states (from Virginia into North Carolina) in both of which (as well as in other Southern states) it has long been the custom to require the separation of white and colored persons, not only in common carriers, but in many other places of public use or patronage. The proposed trip was through an area throughout all of which this practice has been uniform and founded on the general sentiment of the people in that area. The plaintiff would not have been subjected to different rules or customs in the different states through which he traveled. He would have been confronted with the same rule in North Carolina which he met with in Virginia. There was no burden or inconvenience arising from meeting the varying customs of different states. It was for the purpose of conforming to the usages and customs of the states through which it operated that the defendant promulgated its rule as to the seating of passengers. And it was such a rule, conforming to "the established usages, customs and traditions of the people" and "induced by the general sentiment of the community" which was held in Chiles v. Chesapeake & O. Ry. Co. to be a reasonable one.

It may also be conceded that a regulation or custom which was deemed reasonable a generation ago, may not necessarily be so at the present time. But I am unable to say that as of today the prevailing practice in the Southern states of the separation of white and colored passengers on common carriers is arbitrary and without reasonable basis when viewed in the light of the responsibility resting on such carriers to assure that travel on their conveyances shall, so far as possible, be free from disorder, disturbance or unpleasant incident. Among the witnesses in this case were the President of the defendant company and the Presidents of two other bus companies operating in Virginia, North Carolina and other Southern states. There was testimony also from public officials of the states of Virginia and North Carolina whose duties related to the supervision of motor carriers operating in those states. All of these

witnesses agreed in the opinion that the separation of white and colored persons traveling by bus within the territory named was desirable and in the interest of both races. There is no ground for charging these witnesses personally with the harboring of racial prejudices and they testified with evident sincerity in expressing the view, born of their observation and experience, that the seating of white and colored passengers indiscriminately would increase the occasions for arguments, altercations and disturbances among passengers leading to annoyance, discomfort and possible danger to passengers of both races. The opinion of these men whose activities are concerned with the operation of these carriers cannot be ignored in determining whether the rules adopted for the seating of passengers are reasonable ones. No matter how much we may deplore it, the fact remains that racial prejudices and antagonisms do exist and that they are the scource of many unhappy episodes of violence between members of the white and colored races. ' If it is the purpose of the defendant here to lessen the occasions for such conflicts by adoption of a rule for the separate seating of white and colored passengers, this court cannot say that such a rule is purely arbitrary and without reasonable basis.

■■ It must be repeated and steadily borne in mind that the power to regulate interstate commerce is vested in Congress. This power Congress has, within certain limits, delegated to the Interstate Commerce Commission. To what limits the powers of this latter body extend need not be inquired into. The fact remains that neither Congress nor any agency created by it has sought to impose any regulation dealing with the separation of passengers in interstate commerce. The fact that such separation has long been enforced in a number of states by custom and by the rules of common carriers operating in such states is a matter of public knowledge of which the members of Congress are fully aware. In fact, although efforts have been made over some years to induce Congress to enact legislation on this subject, it has consistently refused to attempt such regulation. There can be no other inference than that Congress has thought it wise and proper that the matter should be left for determination to such reasonable rules as the carriers might themselves adopt and that it considered that rules providing for the segregation of passengers in those sections where they were applied were reasonable ones. By its refusal to nullify the practices and regulations of these carriers in respect to the separation of passengers, Congress has by the strongest implication given its approval to them. This is a field of Congressional duty and responsibility. This court cannot invade it and, by usurping the powers of Congress, lay down rules by which this defendant must guide the operation of its business — rules which Congress, in the exercise of power specifically and solely entrusted to it, has refused to lay down.

Upon consideration, therefore, I am of opinion that the defendant's motion for a directed verdict in its favor should have been granted. The motion to set aside the verdict and judgment and for entry of final judgment in favor of defendant will be granted.