**HENDERSON v. UNITED STATES et al.**
Civil Action No. 2455.

District Court, D. Maryland.
Dec. 17, 1945.

Belford V. Lawson, of Washington, D. C., and Josiah F. Henry, Jr., of Baltimore, Md., for plaintiff.

Charles Clark, of Washington, D. C., for Southern Railway.

Daniel W. Knowlton and Edward M. Reidy, both of Washington, D. C., for Interstate Commerce Commission.

Before SOPER, Circuit Judge, and COLEMAN and CHESNUT, District Judges.

COLEMAN, District Judge.

This is a suit under the provisions of 28 U.S.C.A. §§ 41(28), 43–48, 792, and 49 U.S.C.A. § 17(9), whereby the plaintiff seeks to set aside an order of the Interstate Commerce Commission, entered May 13, 1944, with respect to dining car service on the Southern Railway.

On October 10, 1942, the plaintiff filed a complaint with the Commission alleging (as amended at the original hearing) that the Southern Railway, on May 17, 1942, had, with respect to its dining car service, unjustly discriminated against him in violation of the provisions of Section 3(1) of the Interstate Commerce Act, 49 U.S.C.A. § 3(1), and Section 2, Par. 1 of Article IV of the Constitution of the United States, by failing to furnish him dining car service equal to that furnished white passengers. The complaint prayed that the Commission require the carrier to cease and desist from the alleged discrimination; in the future to afford complainant and other interested Negro passengers dining car facilities and such other services and facilities as the Commission might deem reasonable and just, equal to those accorded its white passengers, and asked also for damages to be assessed against the carrier because of the alleged discrimination.

The Southern Railway answered the complaint, denying that it had violated any Constitutional provision or any provision of the Interstate Commerce Act or of any other law. The complaint, according to the usual procedure, was referred by the Commission to an examiner for the purpose of conducting a hearing, which was held on February 24, 1943. At this hearing, complainant alone testified in his own behalf and six witnesses were heard for the railroad.

The examiner filed his report on May 28, 1943, recommending that the Commission should find that complainant had been subjected to unjust discrimination and prejudice, but that the situation had been corrected for the future and that, therefore,

the complaint should be dismissed. Complainant excepted to the examiner's report, alleging that the Virginia segregation statute, Virginia Code 1942 (Michie), §§ 3962–3968, upon which the examiner relied in part, was inapplicable; that segregation of races is contrary to the Federal Constitution and the Interstate Commerce Act; that damages should be assessed, and that the alleged discrimination and prejudice had not been corrected for the future. Thereupon, the complainant was granted a hearing before Division No. 2 of the Commission, briefs were filed and oral arguments submitted, and on May 13, 1944, that Division filed its report (Henderson v. Southern R. Co., 258 I.C.C. 413), making detailed findings of fact and conclusions based thereon, all of which are substantially in accord with the examiner's report and recommendations.

The material facts as found by the Commission and set forth in its report, are not disputed by the parties in the present proceeding and are as follows: On May 17, 1942, the complainant, a Negro, citizen of the United States, left Washington at approximately two p.m. aboard the Southern Railway's Train No. 35, for Atlanta, Georgia, traveling as a first class Pullman passenger. The train consisted of 1 combination baggage-passenger car, 6 coaches, 2 Pullman cars and 1 dining car with seats for 36 persons. It carried approximately 300 passengers, about 100 more than the usual number, which necessitated the use of 3 extra coaches. The Pullman cars were in the rear of the dining car, thus making it necessary for Pullman passengers desiring dining car service to enter the diner alongside the kitchen of the dining car. From this end the tables on the left side of the diner accommodated 4 persons and those on the right side, 2 persons. The diner was equipped with curtains which, when drawn, separated the two tables nearest the kitchen from the other tables, these curtains extending, when drawn, from the sides of the diner to but not across its center aisle, nor along the aisle side of either of these end tables.

When the diner was opened about 5:30 p.m. on May 17, 1942, and as the train was proceeding through the State of Virginia, a number of passengers were waiting to enter. It filled promptly. When all tables other than the two tables at the kitchen end of the car had been occupied, no Negro passenger having appeared, white passengers were seated at the end tables. Some of the passengers who were in line when the diner was opened, remained standing when the car was filled. Complainant did not take a position in the line but walked past people who were waiting to be served in turn. At least one seat at one of the end tables at the kitchen end of the diner was empty when complainant first demanded service but neither then nor later was either of these end tables entirely vacant. The diner was filled continuously, passengers from the line taking seats as soon as others vacated them, and from time to time diner patrons were served dinner until it became necessary to decline further service, in order that the car would be clear of patrons when the train reached Greensboro, North Carolina. Complainant was tendered and declined service in his Pullman car space without charge therefor in addition to the regular dining car prices. The service offered him differed from that furnished in the dining car only as respects the place of service. The steward did not send for complainant as he had promised to do because at no time during the meal period was there available space in which complainant could be served in the diner in a compartment separated from tables that were occupied by white passengers. Complainant was one of many passengers who sought dining car service and who had not been served when the car was removed from the train at approximately 9:00 p.m.

For many years, it was defendant's practice to serve meals to passengers of different races at different times. Negro passengers, being in the minority, were served either before or after the white passengers had eaten. The increase in passenger traffic in 1941, due to defense activities, made necessary some plan whereby both races could be accommodated at the same time. It was found that the length of time required for serving white passengers would extend into the time for the next meal, leaving no time in which to serve Negro passengers. The installation of curtains was designed to correct that situation. Since the time of complainant's journey, defendant's dining cars have been equipped with 4-seat tables on both sides, thereby increasing to 48 the capacity of the car, and to 8 the number of seats at the end tables.

In July 1941, defendant issued to its passenger department employees a circular of instructions concerning accommodations

for passengers of different races, which contains the following:

### "Dining Car Regulations

"Meals should be served to passengers of different races at separate times. If passengers of one race desire meals while passengers of a different race are being served in the dining car, such meals will be served in the room or seat occupied by the passenger without extra charge. If the dining car is equipped with curtains so that it can be divided into separate compartments, meals may be served to passengers of different races at the same time in the compartments set aside for them."

On August 6, 1942, these instructions were supplemented as follows:

"Effective at once please be governed by the following with respect to the race separation curtains in dining cars:

"Before starting each meal pull the curtains to service position and place a 'Reserved' card on each of the two tables behind the curtains.

"These tables are not to be used by white passengers until all other seats in the car have been taken. Then if no colored passengers present themselves for meals, the curtain should be pushed back, cards removed and white passengers served at those tables.

"After the tables are occupied by white passengers, then should colored passengers present themselves they should be advised that they will be served just as soon as those compartments are vacated.

" 'Reserved' cards are being supplied you."

As passengers enter the dining car when it is opened for meal service, it is defendant's practice to seat some of them at each waiter's "station," or group of tables, so that all the waiters may be engaged promptly and service expedited. If any Negro passengers are present, they are seated and served at the end tables. Relatively few Negro passengers use the dining car, and for that reason the end tables are not absolutely reserved for their exclusive use; but white passengers are not seated at them until the other tables are filled. Then, if no Negro passengers present themselves, the end tables are used for white passengers. If a Negro passenger requests service when both end tables are fully or partially occupied by white patrons, the practice is to offer him service in his Pullman space or at his coach seat, using a portable table, without the extra charge usually made for that service. When so served, the passenger receives the same food and waiter service that is furnished dining car patrons, and the dishes, silverware, and linens are those used in the dining car. Negro civilians are served in the dining car simultaneously with white passengers only at the end tables. White and Negro soldiers are served together, without distinction.

On these facts the Commission made three ultimate findings: (1) That defendant's treatment of complainant with respect to dining car service subjected him to undue and unreasonable prejudice and disadvantage in violation of Section 3 of the Interstate Commerce Act; but that (2) the defendant's dining car rules and regulations in effect at the time in question, when considered with defendant's supplementary rules and regulations issued on August 6th, 1942, are adequate, and therefore no order in respect to these rules was necessary for the future; and (3) that complainant had sustained no compensable damage as a result of the disadvantage caused him by defendant. Accordingly, the Commission issued its order on May 13, 1944, dismissing the complaint. Thereafter, complainant petitioned for a hearing before the full Commission, but this was denied by order entered September 18, 1944, and on January 26, 1945, the present proceeding was instituted. In the complaint it is alleged that the treatment given the complainant with respect to dining car service violated (1) Section 3(1) of the Interstate Commerce Act, 49 U.S.C.A. § 3 (1); (2) the national transportation policy as defined in that Act, 49 U.S.C.A. note preceding § 1; and (3) the Civil Rights Act, 8 U.S.C.A. §§ 41, 43, enforcing Section 1 of the Fourteenth Amendment of the Constitution of the United States.

The specific form of injunctive relief sought is that the Commission order the Southern Railway Company to cease and desist from the form of treatment with respect to dining car service given the complainant, and to establish and enforce in the future, for the benefit of complainant and other Negro passengers, dining car facilities and services unconditionally identical with those established and enforced for white passengers, including the discontinuance of the Railway Company's present practice of using curtains around dining

car tables provided for Negro passengers. The complainant concedes that the Commission's denial of damages is not reviewable by this Court. See Standard Oil Co. v. United States, 283 U.S. 235, 51 S.Ct. 429, 75 L.Ed. 999; George Allison & Co. v. United States, 296 U.S. 546, 56 S.Ct. 175, 80 L.Ed. 387; Ashland Coal & Ice Co. v. United States, D.C., 61 F.Supp. 708, affirmed per curiam, 65 S.Ct. 1573.

For a proper understanding of what the Commission decided, apart from the matter of damages, we quote the following from its opinion (258 I.C.C. 413, at pages 418, 419):

"The Interstate Commerce Act neither requires nor prohibits segregation of the races. The regulations of a carrier requiring separation of white and Negro passengers have been held not unlawful when applied to interstate passengers. See Chiles v. Chesapeake & O. R. Co., 218 U.S. 71 [30 S.Ct. 667, 54 L.Ed. 936, 20 Ann.Cas. 980], and cases therein cited. Section 3(1) of the act [49 U.S.C.A. § 3(1)], provides that it shall be unlawful for any common carrier subject thereto to make, give, or cause any undue or unreasonable preference or advantage to any particular person in any respect whatsoever; or to subject any particular person to any undue or unreasonable prejudice or disadvantage in any respect whatsoever. In Mitchell v. United States, 313 U.S. 80, 97 [61 S.Ct. 873, 85 L.Ed. 1201], the Court said that while the supply of particular facilities may be conditioned upon there being a reasonable demand therefor, if facilities are provided, substantial equality of treatment of persons traveling under like conditions cannot be refused. Thus it is seen that substantial equality of treatment only is required of the carrier.

"It is clear that complainant returned to his seat after his various appearances in the dining car with the distinct impression or understanding conveyed to him by the steward that in a short time space would be available for serving him in the dining car and that he would be notified. The steward could have consummated his understanding with complainant by not allowing additional white passengers to be seated at the end tables. If that procedure had been followed, an end table would have been entirely vacated as soon as the white passengers, initially seated there, had completed their meals. As above indicated, complainant stresses the failure to seat him at an end table and to notify him as promised. In our opinion, the circumstances afford sufficient basis for a finding in favor of complainant.

"As far as the record is concerned, the occurrence complained of was but a casual incident, brought about by bad judgment of an employee of the defendant who had an overload of work to be done in a limited space and short time. The difficulties encountered were, no doubt, due to a large extent to the overcrowding of the train, resulting from war-time conditions. The record does not disclose that the defendant's general practice, as evidenced by its present instructions, will result in any substantial inequality of treatment as between Negro and other passengers seeking dining-car service.

"We find that complainant was subjected to undue and unreasonable prejudice and disadvantage in the respect already stated. As defendant's present instructions to its employees seem adequate, the entry of an order for the future in this respect would serve no useful purpose."

The questions presented for our determination in this proceeding are basically two, as evidenced by complainant's contentions, and may be summarized as follows: (1) Is any form of racial segregation of interstate passengers in dining cars a preference, prejudice or discrimination in and of itself in violation of the Civil Rights Act, or the Interstate Commerce Act, or both; and (2) even if a certain degree of such segregation be valid, are the present rules and regulations of defendant respecting its dining car service nevertheless invalid because they do not provide substantial equality of treatment in that (a) curtained tables are required for Negroes and not for whites; and (b) service at such tables may be refused even though there be empty seats at such tables?

The position of the Interstate Commerce Commission is that (1) although it has found that in the particular instance complainant had been subjected to undue and unreasonable prejudice and disadvantage, it further found that such was the result of a casual incident and not of the Railroad's general practice, and therefore the entry of an order for the future would serve no useful purpose, and the decision of the Commission in this respect being founded upon a rational basis, should not be disturbed; and (2) to order the Commission to require the railroad to do more

would be, in effect, to order that segregation cease, whereas neither the Commission nor this Court has jurisdiction in the present proceeding to determine whether or not segregation in and of itself is a discrimination forbidden by the Constitution, the Interstate Commerce Act, or any other Federal statute.

The Southern Railway, as intervening defendant, contends that the finding that its existing rules are adequate, is a determination of fact within the exclusive jurisdiction of the Commission, and therefore may not be upset by this Court.

■ The Government has not seen fit to be represented separately and to take part in any phase of this litigation from its inception, as it has the statutory right to do. This, however, does not foreclose the intervening defendant, the Southern Railway, from challenging the action of the Commission. Interstate Commerce Commission v. Oregon-Washington R. Co., 288 U.S. 14, 53 S.Ct. 266, 77 L.Ed. 588.

At the outset we must determine whether there is any merit in the jurisdictional question raised by the Commission, namely, that this Court may not alter the Commission's finding of equality of treatment since that is a determination of fact exclusively within the jurisdiction of the Commission.

■ The Commission's position, it will be seen, is tantamount to saying that in a case of this kind judicial review of the Commission's action is completely foreclosed, even as respects the question of whether it may have exceeded its statutory or constitutional authority in entering a particular order. We do not understand that such is the law. The Supreme Court said in Rochester Telephone Corporation v. United States, 307 U.S. 125, 139, 59 S. Ct. 754, 761, 83 L.Ed. 1147, that two specific doctrines limiting judicial review of orders of the Interstate Commerce Commission have been evolved. "One is the primary jurisdiction doctrine, firmly established in Texas & Pacific R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, 9 Ann.Cas. 1075. Thereby matters which call for technical knowledge pertaining to transportation must first be passed upon by the Interstate Commerce Commission before a court can be invoked. The other is the doctrine of administrative finality. Even when resort to courts can be had to review a Commission's order, the range of issues open to review is narrow. *Only questions affecting constitu-*

*tional power, statutory authority and the basic prerequisites of proof can be raised.* If these legal tests are satisfied, the Commission's order becomes incontestable. Interstate Commerce Comm'n v. Illinois Central R. Co., 215 U.S. 452, 470, 30 S.Ct. 155, 160, 54 L.Ed. 280; Interstate Commerce Comm'n v. Union Pacific R. Co., 222 U.S. 541, 32 S.Ct. 108, 56 L.Ed. 308." (Italics inserted.)

■ The complainant is directly asserting in this proceeding that to allow the Commission's order here under review to stand, would be tantamount to approving a rule or practice on the part of the Southern Railway that is violative of complainant's constitutional rights and not within the statutory power of the Interstate Commerce Commission to approve, so we are called upon not merely to review the correctness of a factual situation upon which the Commission has ruled, in a field exclusively within its province—as for example, one involving rates or other charges by an interstate carrier—but to rule upon questions, the determination of which has not been, and cannot be exclusively delegated to any administrative body, but must remain subject to judicial review. The fact that the Commission's order is negative in form, i. e., that it dismissed the complaint, makes no difference. Rochester Telephone Corporation v. United States, supra; Mitchell v. United States, 313 U.S. 80, 61 S.Ct. 873, 85 L.Ed. 1201.

We turn then to a consideration of the first of complainant's two basic contentions, namely, that any form of racial segregation of interstate passengers in dining cars should be declared to be, in and of itself, a form of discrimination forbidden by the Federal Constitution and the Interstate Commerce Act.

■ We must at the very outset recognize the distinction between segregation and equality of treatment. The equal rights clause of the Constitution, Article IV, Section 2, does not import that a citizen of one State carries with him into another State any fundamental privileges or immunities which come to him necessarily by the mere fact of his citizenship in the State first mentioned, but simply that in any State, every citizen of every other State shall have the privileges and immunities which the citizens of that State enjoy. In short, this provision merely prevents a State from discriminating against citizens of other States in favor of its own citizens.

Downham v. Alexandria Council, 10 Wall. 173, 19 L.Ed. 929; Chambers v. Baltimore & Ohio R. Co., 207 U.S. 142, 28 S.Ct. 34, 52 L.Ed. 143; LaTourette v. McMaster, 248 U.S. 465, 39 S.Ct. 160, 63 L.Ed. 362; Chalker v. Birmingham & N. W. R. Co., 249 U.S. 522, 39 S.Ct. 366, 63 L.Ed. 748; Shaffer v. Carter, 252 U.S. 37, 40 S.Ct. 221, 64 L.Ed. 445; United States v. Wheeler, 254 U.S. 281, 41 S.Ct. 133, 65 L.Ed. 270; Douglas v. New York, New Haven & Hartford R. Co., 279 U.S. 377, 49 S.Ct. 355, 73 L.Ed. 747; Whitfield v. Ohio, 297 U.S. 431, 56 S.Ct. 532, 80 L.Ed. 778; Hague v. C. I. O., 307 U.S. 496, 59 S.Ct. 954, 83 L. Ed. 1423. Similarly, the Fourteenth Amendment created no rights in citizens of the United States, but merely secured existing rights against State abridgement. The Slaughterhouse-Cases, 16 Wall. 36, 21 L.Ed. 394. And it has been repeatedly declared by the Supreme Court that race segregation by State law is not per se an abridgement of any constitutional right secured to the citizen. See Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256; McCabe v. Atchison T. & S. F. R. Co., 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169; Missouri ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208. By virtue of the Commerce Clause of the Constitution, Congress might legislate specifically with respect to segregation in interstate travel, but Congress has not done so. However, Section 3, paragraph 1 of the Interstate Commerce Act makes it unlawful to subject any person in interstate commerce to any undue or unreasonable prejudice or disadvantage in any respect whatsoever, and this prohibition clearly embraces the matter of dining car facilities, just as seating, sleeping or any other facilities in interstate commerce. Stamps v. Chicago, R. I. & P. Ry. Co., 253 I.C.C. 557; LeFlore & Crishon v. Gulf, M. & O. R. R. Co., 262 I.C.C. 403; Barnett v. Texas & P. Ry. Co., 263 I.C.C. 171. Furthermore, the right to a particular accommodation or facility does not depend upon the volume of traffic, because although the supply of particular accommodations or facilities may be conditioned upon there being a reasonable demand therefor, if such accommodations or facilities are in fact provided, substantial equality of treatment of persons traveling under like conditions cannot lawfully be withheld. Mitchell v. United States, supra. Thus, while inaction of Congress as respects segregation in inter-

state travel is equivalent to a declaration that interstate carriers can separate Negro and white passengers, they may do so only if they afford substantial equality of treatment to members of both races when traveling under like conditions. Hall v. DeCuir, 95 U.S. 485, 24 L.Ed. 547; Louisville, etc., R. Co. v. Mississippi, 133 U.S. 587, 10 S.Ct. 348, 33 L.Ed. 784; Plessy v. Ferguson, supra; Chesapeake & Ohio R. Co. v. Kentucky, 179 U.S. 388, 21 S.Ct. 101, 45 L.Ed. 244; Chiles v. C. & O. R. Co., 218 U.S. 71, 30 S.Ct. 667, 54 L.Ed. 936, 20 Ann. Cas. 980; McCabe v. Atchison T. & S. F. R. Co., supra. Therefore, although the Supreme Court of Appeals of Virginia has held, since the Commission decided the present case, in Morgan v. Commonwealth, 184 Va. 24, 34 S.E.2d 491, that the Virginia segregation laws with respect to public motor carriers, which are kindred to that State's segregation laws with respect to rail carriers—all of which laws were in effect at the time the discrimination against the present complainant is alleged to have occurred—apply to interstate as well as intrastate passengers, it is not necessary to approach the present case from this aspect, because, as we have said, the real question before us is not one of segregation, but of equality of treatment. Furthermore, the Commission in its opinion does not rely upon State statutes or decisions; and likewise, the railway company does not rely upon them. As a matter of fact, the Virginia statute could not be successfully relied upon in the present case because it does not, at least in terms, purport to embrace dining car service. Virginia Code 1942 (Michie) §§ 3962, 3963. These sections read:

"Sec. 3962. Separate cars for white and colored passengers.—All persons, natural or artificial, who are now, or may hereafter be, engaged in running or operating any railroad in this State by steam for the transportation of passengers are hereby required to furnish separate cars or coaches for the travel or transportation of the white and colored passengers on their respective lines of railroad. Each compartment of a coach divided by a good and substantial partition, with a door therein, shall be deemed a separate coach within the meaning of this section, and each separate coach or compartment shall bear in some conspicuous place appropriate words in plain letters, indicating the race for which it is set apart."

"Sec. 3963. Company to make no discrimination in quality of accommodations for white and colored passengers.—No difference or discrimination shall be made in the quality, convenience or accommodation in the cars or coaches or partitions set apart for white and colored passengers under the preceding section."

Note the above provisions, even if they could be said to embrace dining cars, have not been satisfied in the present case because nothing short of race segregation in separate cars, or in compartments "divided by a good and substantial partition, with a door therein," would satisfy those provisions.

It therefore being clear that racial segregation of interstate passengers is not per se forbidden by the Constitution, the Interstate Commerce Act, or any other Act of Congress, we turn to a consideration of complainant's second contention, which is that, even though it be held that the defendant carrier may lawfully segregate complainant because of his race while affording him dining car facilities, the segregation actually still permitted by the defendant railroad's present regulations which the Commission has approved is unlawful, because not affording him treatment substantially equal to that afforded white passengers under like conditions.

This contention brings us at once face to face with the necessity of passing upon the validity of the dining car regulations of the Southern Railway, in effect at the time in question, because although these regulations have not been promulgated by the Interstate Commerce Commission, they have been directly approved by it, as a result of its decision and order which is the basis of the present complaint. Therefore, they are to be treated, for the purposes of this case, as in effect the Commission's rules. This is obviously true for the further reason that the present complainant is contending that the Commission erred in not requiring the Southern Railway to cease and desist from applying these rules; or more specifically, that the Southern Railway should be required henceforth to abstain from adopting any rule or regulation with respect to its dining-car service that imposes—as it is claimed the present rules do—upon Negro passengers, restrictions not imposed upon white passengers, under like conditions. Complainant's right to complain does not depend upon whether he intends to make a similar journey in the future. Mitchell v. United States, supra.

These dining-car regulations have been quoted in an earlier part of this opinion in their entirety. It is to be noted that what the present complainant is really seeking is that he shall be given an absolute right to —a guarantee of—*the same service in every respect* accorded to white passengers under like conditions. The defendant's dining car regulations in effect on May 17, 1942, that is, at the time of the alleged discrimination against the complainant, contained only a very general provision with respect to service of meals in dining cars at one and the same time to Negro and white passengers. They merely provided that "if the dining car is equipped with curtains so that it can be divided into separate compartments, meals may be served to passengers of different races at the same time in the compartments set aside for them."

As we have seen, applying his own interpretation to this rule, the dining car steward allowed white passengers to occupy the end seats allotted to colored passengers before the complainant appeared and applied for diner service; and that, since the train was crowded with white passengers, he, the steward, continued to allow additional white passengers to be seated and served at these end tables, with the result that there never was a time during the hours when the dining car was open to passengers, that meals could be served therein to the complainant or to any other Negro passengers, at any table at which there were not one or more white passengers. This, as we have seen, the Commission found resulted in an unjust, undue and unreasonable prejudice and disadvantage to complainant in violation of Section 3(1) of the Interstate Commerce Act. It is our opinion that this conclusion was correct. However, the Commission further found that the supplementary dining car regulations put into effect by the defendant carrier on August 6, 1942, adequately provided against the recurrence of such prejudice and disadvantage as respects complainant or any other possible Negro passengers on defendant's lines, and therefore, the Commission deemed the entry of an order for the future would serve no useful purpose. We are thus called upon to determine whether or not this interpretation by the Commission of the carrier's rules now in effect is correct; that is to say, we must

determine whether they do, in fact, afford substantial equality of treatment to both Negro and white passengers with respect to dining car service.

We requote the pertinent parts of these supplementary instructions as follows:

"Before starting each meal pull the curtains to service position and place a "Reserve' card on each of the two tables behind the curtains.

"These tables are not to be used by white passengers until all other seats in the car have been taken. Then if no colored passengers present themselves for meals, the curtain should be pushed back, cards removed and white passengers served at those tables. After the tables are occupied by white passengers, then should colored passengers present themselves, they should be advised that they will be served just as soon as those compartments are vacated."

 It is to be noted that the above instructions do not in fact require the setting aside of the two tables referred to *exclusively* for Negro passengers, but merely say that they "are not to be used by white passengers until all other seats in the car have been taken. Then if no colored passengers present themselves for meals, the curtain should be pushed back, cards removed and white passengers served at those tables." Obviously, the word "then" refers to any time during which meals are being served when there happen to be more white passengers applying for meals than can be accommodated at other than the reserved tables. At least if it does not mean this, it gives no indication to the steward as to how long he should wait before assuming that no Negro passengers *will* present themselves. Nothing is contained in the regulations requiring the steward to take steps to ascertain whether there be any such persons on the train. Furthermore, the regulations do not take into account the probability that a Negro passenger may not desire a meal as soon as he boards the train and the dining car opens, or that he may board the train at an intermediate point after the dining car service has been begun and may desire at that time or later to be served in the dining car. In none of these contingencies do the regulations offer any assurance that the Negro passenger will have a reasonable chance to be served in the dining car before his journey ends.

Therefore, we believe that the Commission erred in holding that the defendant's general practice as evidenced by its current instructions, will result in no substantial inequality of treatment as between Negro and other passengers seeking dining car service. In the case of the white passenger, he is merely required to wait his turn along with all other passengers, whereas in the case of the Negro passenger, he is given a like opportunity along with other Negro passengers only in the event that when he presents himself at the dining car, none of the seats conditionally reserved for Negro passengers' use has been assigned to a white passenger; and if it has been so assigned, then, even when vacated, it nevertheless remains unavailable to him unless and until all of the other seats under the same conditional reservation are not in use by white passengers. It seems obvious to us that this arrangement does not afford that substantial equality of treatment which the equality of all citizens in the eye of the law requires. None of the methods of segregation have been employed which have heretofore been deemed to be within the law, such as the service of the races under like conditions at different times or the setting aside of a separate car or a portion of a car for the colored race; and while the great majority of the tables are set aside for the exclusive use of white passengers, none are set aside exclusively for Negro passengers.

 We accept the Commission's construction of the supplemental regulation and its finding that the general practice thereunder was that no further white passengers could be seated at the tables reserved for colored passengers after one of the latter applied for dining car service. But nevertheless in our opinion the regulation so construed, applied and practiced does not constitute substantial equality of treatment for white and colored passengers. We do not question the authority of the Commission to approve the segregation of white and colored passengers by the reservation of particular tables for colored passengers; nor do we think it unreasonable, in view of the recently prevailing abnormal demands on the railroads for passenger and dining car transportation services, that white passengers should be seated at tables reserved for colored passengers when there are no colored passengers applying for service. But if white passengers are thus seated at the tables reserved for colored passengers, then equality of treatment requires that a colored passenger

subsequently applying for service should be seated at any available vacant seat in the dining car, either in the compartment reserved for colored passengers or, if none there, elsewhere in the dining car.

The analogy of the Mitchell case is very close. There, Mr. Chief Justice Hughes, in the course of the Court's opinion, said (313 U.S. 80, at pages 96, 97, 61 S.Ct. 873, at page 877, 85 L.Ed. 1201): "It does not appear that colored passengers who have bought first-class tickets for transportation by the carrier are given accommodations which are substantially equal to those afforded to white passengers. The Government puts the matter succinctly: 'When a drawing room is available, the carrier practice of allowing colored passengers to use one at Pullman seat rates avoids inequality as between the accommodations specifically assigned to the passenger. But when none is available, as on the trip which occasioned this litigation, the discrimination and inequality of accommodation become self-evident. It is no answer to say that the colored passengers, if sufficiently diligent and forehanded, can make their reservations so far in advance as to be assured of first-class accommodations. So long as white passengers can secure first-class reservations on the day of travel and the colored passengers cannot, the latter are subjected to inequality and discrimination because of their race.'

&ast; &ast; &ast; &ast; &ast; &ast;

"While the supply of particular facilities may be conditioned upon there being a reasonable demand therefor, if facilities are provided, substantial equality of treatment of persons traveling under like conditions cannot be refused."

The alternative offered the Negro passenger of being served at his seat in the coach or in the Pullman car without extra charge does not in our view afford service substantially equivalent to that furnished in a dining car. True, some passengers may prefer not to patronize a diner, and we will assume that the menu is the same and the service scarcely, if at all, less expeditious when meals are served in coaches or Pullman cars. Nevertheless, the Negro passenger is entitled to dine with friends if he sees fit to do so, and should not be unnecessarily subjected to the inconvenience of dining alone under the crowded conditions which service, especially in a coach or in a sleeper, may entail. Here again the analogy to the Mitch-

ell case is so close as to compel a like conclusion with respect to furnishing meals in Pullman cars or in coaches.

There remains to be considered one additional contention of the complainant, namely, that that part of the railroad's regulations which requires tables for Negro passengers in dining cars to be curtained also violates the rule of substantial equality in that such means of separation causes Negro passengers humiliation and embarrassment to which white passengers are not subjected. Without minimizing the criticism directed at this feature of the service, we point out that the principle of segregation has been approved by the Supreme Court and that the method of carrying it into execution is for the Commission to determine.

For the reasons given herein, the order of the Commission dismissing the complaint must be set aside and the case remanded to the Commission for further proceedings in the light of the principles outlined herein.