HENDERSON v. INTERSTATE COMMERCE COMMISSION et al.

Civ. No. 3829.

United States District Court

D. Maryland.

Sept. 25, 1948.

Lawson, McKenzie & Windsor and B. V. Lawson, Jr., both of Washington, D. C., and Josiah F. Henry, Jr., of Baltimore, Md., for plaintiff.

Daniel W. Knowlton and Allen Crenshaw, both of Washington, D. C., for Interstate Commerce Commission.

Bernard J. Flynn, U. S. Atty., of Baltimore, Md., and Edward Dumbald and William D. McFarlane, both of Washington, D. C., for the United States.

Charles Clark and A. J. Dixon, both of Washington, D. C., for Southern R. Co.

Before SOPER, Circuit Judge, and COLEMAN and CHESNUT, District Judges.

COLEMAN, District Judge.

This suit is brought by the plaintiff, under the provisions of 28 U.S.C.A. §§ 1336, 1398, 2284, 2321–2325, 49 U.S.C.A. § 17(9), to set aside an order of the Interstate Commerce Commission entered on September 5, 1947. The contested order involves dining car service afforded Negro passengers on the Southern Railway. This is the second time that the present plaintiff has litigated the question before the Commission and this Court. The Southern Railway asked for, and was granted leave to intervene as a party defendant, it having been the sole defendant in the proceeding before the Commission which resulted in the issuance of the order which plaintiff now seeks to annul.

The facts involved in the prior proceeding, before both the Commission and this Court, which led up to the present suit may be summarized as follows: On October 10, 1942, the plaintiff, a Negro, filed a complaint with the Interstate Commerce Commission alleging that on May 17, 1942, while traveling as a first class passenger on the Southern Railway from Washington, D. C. to Atlanta, Georgia, that Railway subjected him to undue and unreasonable prejudice and disadvantage, in derogation of his rights under the Federal Constitution and the Interstate Commerce Act, (1) by providing insufficient tables and service for Negroes in its dining car; (2) by the use of a curtain around the tables allegedly reserved for Negroes; and (3) by giving preference and advantage to white persons, in that it failed and refused to serve plaintiff at tables in its dining car where there were empty seats, these tables and seats, although allegedly reserved for Negroes, being allowed to be used by white persons. The Commission was asked to require defendant to desist from such discrimination and, in the future, to establish for the transportation of Negro interstate passengers over its lines equal and just dining car facilities, and such other services and facilities as the Commission might consider reasonable and just. Plaintiff also asked for damages by reason of the alleged discrimination.

After due hearing, on May 13, 1944, Division No. 2 of the Commission rendered its report (258 I.C.C. 413) in which it found that while plaintiff had been subjected to undue and unreasonable prejudice and disadvantage, it, nevertheless, found that there was no basis for an award of damages by way of reparation, or necessity for an order for the future. The Commission said (258 I.C.C. 419): "As far as the record is concerned, the occurrence complained of was but a casual incident, brought about by bad judgment of an employee [the dining car steward] of the defendant who had an overload of work to be done in a limited space and short time. The difficulties encountered were, no doubt, due to a large extent to the overcrowding of the train, resulting from war-time conditions. The record does not disclose that the defendant's general practice, as evidence by its present instructions, will result in any substantial inequality of treatment as between Negro and other passengers seeking dining car service.

"* * * As defendant's present instructions to its employees seem adequate, the entry of an order for the future in this respect would serve no useful purpose." Accordingly, the Commission dismissed the complaint.

On appeal to this Court to set aside the action of the Commission, we held (Henderson v. United States, D.C., 63 F.Supp. 906) that while racial segregation of interstate passengers is not per se forbidden either by the Federal Constitution, the Interstate Commerce Act or any other Act of Congress, the Commission, nevertheless, erred in holding that the Southern Railway's general practice, as evidenced by its

then current dining car regulations or instructions, would result in no substantial inequality of treatment between Negro and other passengers seeking dining car service. We so found for the reasons as stated in our detailed opinion, as follows (63 F.Supp. 906, at pages 915, 916): "In the case of the white passenger, he is merely required [by the Railway's dining car regulations] to wait his turn along with all other passengers, whereas in the case of the Negro passenger, he is given a like opportunity along with other Negro passengers only in the event that when he presents himself at the dining car, none of the seats conditionally reserved for Negro passengers' use has been assigned to a white passenger; and if it has been so assigned, then, even when vacated, it nevertheless remains unavailable to him unless and until all of the other seats under the same conditional reservation are not in use by white passengers. It seems obvious to us that this arrangement does not afford that substantial equality of treatment which the equality of all citizens in the eye of the law requires. None of the methods of segregation have been employed which have heretofore been deemed to be within the law, such as the service of the races under like conditions at different times or the setting aside of a separate car or a portion of a car for the colored race; and while the great majority of the tables are set aside for the exclusive use of white passengers, none are set aside exclusively for Negro passengers.

"We accept the Commission's construction of the supplemental regulation and its finding that the general practice thereunder was that no further white passengers could be seated at the tables reserved for colored passengers after one of the latter applied for dining car service. But nevertheless in our opinion the regulation so construed, applied and practiced, does not constitute substantial equality of treatment for white and colored passengers. We do not question the authority of the Commission to approve the segregation of white and colored passengers by the reservation of particular tables for colored passengers; nor do we think it unreasonable, in veiw of the recently prevailing abnormal demands on the railroads for passenger and dining car transportation services, that white passengers should be seated at tables reserved for colored passengers when there are no colored passengers applying for service. But if white passengers are thus seated at the tables reserved for colored passengers, then equality of treatment requires that a colored passenger subsequently applying for service should be seated at any available vacant seat in the dining car, either in the compartment reserved for colored passengers or, if none there, elsewhere in the dining car.

"The analogy of the Mitchell case is very close. There, Mr. Chief Justice Hughes, in the course of the Court's opinion, said ([Mitchell v. United States], 313 U.S. 80, at pages 96, 97, 61 S.Ct. 873, at page 877, 85 L.Ed. 1201): 'It does not appear that colored passengers who have bought first-class tickets for transportation by the carrier are given accommodations which are substantially equal to those afforded to white passengers. The Government puts the matter succinctly: "When a drawing room is available, the carrier practice of allowing colored passengers to use one at Pullman seat rates avoids inequality as between the accommodations specifically assigned to the passenger. But when none is available, as on the trip which occasioned this litigation, the discrimination and inequality of accommodation become self-evident. It is no answer to say that the colored passengers, if sufficiently diligent and forehanded, can make their reservations so far in advance as to be assured of first-class accommodations. So long as white passengers can secure first-class reservations on the day of travel and the colored passengers cannot, the latter are subjected to inequality and discrimination because of their race."

\*   \*   \*   \*   \*   \*

" 'While the supply of particular facilities may be conditioned upon there being a reasonable demand therefor, if facilities are provided, substantial equality of treatment of persons traveling under like conditions cannot be refused.'

"The alternative offered the Negro passenger of being served at his seat in the coach or in the Pullman car without extra charge does not in our view afford service substantially equivalent to that furnished

in a dining car. True, some passengers may prefer not to patronize a diner, and we will assume that the menu is the same and the service scarcely, if at all, less expeditious when meals are served in coaches or Pullman cars. Nevertheless, the Negro passenger is entitled to dine with friends if he sees fit to do so, and should not be unnecessarily subjected to the inconvenience of dining alone under the crowded conditions which service, especially in a coach or in a sleeper, may entail. Here again the analogy to the Mitchell case is so close as to compel a like conclusion with respect to furnishing meals in Pullman cars or in coaches."

With respect to the requirement in the Southern Railway's then current dining car regulations that tables for Negro passengers be curtained, we found that this did not violate the rule of substantial racial equality, and stated that the method of carrying out the principle of racial segregation on interstate carriers was a matter for the Commission to determine. However, for the other reason just stated, by decree entered on February 15, 1946, this Court set a-side the order of the Commission dismissing the complaint, and remanded the case to the Commission for further proceedings "in the light of the principles outlined" in our opinion. As a result, the Southern Railway thereupon issued, effective March 1, 1946, the following new instructions for the regulation of its dining car service, canceling the instructions previously in effect:

"Subject: Segregation of White and Colored Passengers in Dining Cars.

To: Passenger Conductors and Dining Car Stewards.

Consistent with experience in respect to the ratio between the number of white and colored passengers who ordinarily apply for service in available diner space, equal but separate accommodations shall be provided for white and colored passengers by partitioning diners and the allotment of space, in accordance with the rules, as follows:

(1) That one of the two tables at Station No. 1 located to the left side of the aisle facing the buffet, seating four persons, shall be reserved exclusively for colored passengers, and the other tables in the diner shall be reserved exclusively for white passengers.

(2) Before starting each meal, draw the partition curtain separating the table in Station No. 1, described above, from the table on that side of the aisle in Station No. 2, the curtain to remain so drawn for the duration of the meal.

(3) A 'Reserved' card shall be kept in place on the left-hand table in Station No. 1, described above, at all times during the meal except when such table is occupied as provided in these rules."

The Commission reopened the proceeding for further hearing; the Southern Railway presented additional evidence, and on September 5, 1947, the Commission filed a report (two Commissioners dissenting in part) in which it affirmed its prior findings to the effect that whereas complainant had been subjected to undue and unreasonable prejudice and disadvantage on one particular occasion, no basis for an award of damages had been shown, and further found that the new dining car regulations established by defendant, effective March 1, 1946, and currently in force, which we have above quoted, were not in violation of Section 3 or any other provision of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq. Accordingly, the Commission refused to enter an order for the future, and dismissed the complaint, whereupon the present suit was brought seeking to annul this latest action on the part of the Commission.

It will thus be seen that the precise question presented for decision is whether the Interstate Commerce Commission, by this second report and order, has fully complied with the direction given to it by this Court when we reversed the earlier action of the Commission dismissing the complaint, and remanded the case to the Commission "for further proceedings in the light of the principles" set forth in our opinion.

The sum and substance of the Commission's position is that the same facts and issues are involved in this proceeding as in the previous one, wtih the exception of the Southern Railway's amended dining car regulations; that these amended regulations, promulgated by the Railway as a result of our prior ruling, have removed the

discrimination found by this Court to have been latent in the Railway's previous regulations, namely, that the Railway now provides adequately and reasonably for the equality of service and treatment of Negroes and whites as required by our decision. We quote the following from the Commission's report (269 I.C.C. 73, at page 76): "The current regulations were designed by the defendant to meet the Court's criticisms of those, set forth at page 415 of the prior report, which they superseded. By the new rules, defendant has abolished its former practice, condemned by the court, of permitting white patrons to be seated at the tables conditionally reserved for colored passengers when all other tables had been occupied, and of refusing to permit a Negro, who applied for service after the tables so reserved for members of his race had been fully or partially occupied by white patrons, to take any vacant seat in the car. Its rules now provide for the absolute reservation of space for the use of Negro passengers exclusively. Under no circumstances are white passengers served in such space; nor are colored passengers served elsewhere in the car. In these respects defendant's present practice appears to conform with the opinion of the court.

"Concerning the adequacy of the space reserved for Negro passengers, defendant's Superintendent of Dining Cars presented in evidence the results of two tests made under his direction and supervision showing the number of meals served to white and Negro patrons, respectively, in dining cars operated by defendant between Washington, D. C., and Atlanta, Ga. During the 11 days May 14 to 24, 1945, a total of 37,615 meals were served, of which 446, or 1.19 percent, were served to Negro civilians and 706, or 1.88 percent, to Negroes in the military service. Of the 20,789 meals served during the first 10 days of October 1946, 723, or 3.48 percent of the total, were served to Negro civilians and 149, or 0.72 percent, to Negro service people. It is defendant's practice to serve white and Negro soldiers together, without distinction. Under the current regulations setting apart four seats for Negroes, slightly more than 8 percent of the seating space in its dining cars is reserved unconditionally for the use of approximately 4 percent of the patrons. The capacity of the cars, now 48 seats, will be reduced to 44 seats as the offices for stewards are installed. A further fact disclosed by the described tests is that rarely is defendant requested to provide diner service for more than four Negroes at the same meal.

"As stated, the ratio of the number of meals served Negro civilians to the total number served all patrons increased from 1.19 percent during the May 1945 test period to 3.48 percent during the October 1946 period. Should the indicated trend continue, substantial equality of treatment may require the reservation of additional accommodations for Negroes in the future. On the record before us, however, the conclusion is inescapable that defendant's rules now provide an equitable and reasonable division between the races of its available dining-car space."

With respect to the curtains separating the tables reserved for Negroes from the other tables, the Commission in its report said (269 I.C.C. 73, at page 75): "At the time of the further hearing, the defendant had removed the curtains from one of its dining cars and had constructed in their stead permanent wood partitions approximately 5 feet high extending from the sides of the car to the aisle. The table which formerly occupied the space opposite the one now reserved exclusively for colored passengers, as described in rule (1) of the foregoing regulations, has been removed and the space is utilized as an office for the steward. That position affords the best view of the entire car, including the entrance to the kitchen and pantry, and from it the steward can best supervise the service. As its dining cars are sent to the shops for repairs in the future, it is defendant's intention to make similar structural changes in all of them."

The case is before us on the testimony presented to the Commission. The correctness of its factual analysis of this testimony as contained in its report is not questioned. Thus, it will be seen that the Railway's amended dining car regulations, contrary to the prior regulations, require the setting aside of a table, seating four per-

sons, exclusively for the use of Negro passengers. Also, the uncontradicted evidence presented to the Commission shows that up to the date of the Commission's decision, the number of Negro passengers seeking dining car service rarely if ever exceeded that number on any one trip. Should that happen, however, the situation would be no different from those instances, not infrequently occurring in interstate railroad transportation, where more white passengers seek dining car service than can be seated at one time. In short, the new regulations, the Commission found, are designed to take into account, with all due regard to the density of Negro travel requiring dining car service, the probability that a Negro passenger may not desire a meal as soon as he boards the train, or that he may board the train at an intermediate point after the dining car service has been begun, and may desire at that time or later to be served in the dining car.

Next, as concerns the matter of curtains separating Negro dining car patrons from the white patrons, in our prior opinion we stated (63 F.Supp. 906, at page 916) that "Without minimizing the criticism directed at this feature of the service, we point out that the principle of segregation has been approved by the Supreme Court and that the method of carrying it into execution is for the Commission to determine." As above explained, the Railway Company is now in the process of abandoning the use of curtains as a means of separating the tables and, in their stead, is constructing in its dining cars permanent, wooden partitions, approximately five feet high, extending from the side of the car to the aisle. Also, it is removing from all of its dining cars the table which had formerly occupied the space directly opposite the table now exclusively reserved for colored passengers, and this space is being utilized as an office for the dining car steward. As also explained in its report, the Commission, in Mays v. Southern Railway Company, 268 I.C.C. 352, decided April 8, 1947, had before it this same question, under precisely the same dining car regulations as those now before us, and found that there was no basis for holding this manner of separation of the different tables to be a forbidden discrimination.

We are satisfied, without further quoting from or analyzing the report of the Commission, that the inequality which we found to exist in the Railway Company's earlier dining car regulations, as respects the facilities afforded white and Negro passengers, has been removed by the Railway's amended regulations. We also believe there is no sound basis for treating the matter of fixed partitions between the tables differently from our treatment of the use of curtains. The same applies also to the location of the table allotted to colored passengers. We do not find that the Commission · has permitted the Railroad to create an unjust discrimination by allotting to such passengers a table at the kitchen end of the dining car, directly opposite the space newly provided for the steward's office. The undesirability of this location compared with that of tables in other parts of the dining car, from the point of view of noise, heat, etc. as alleged by plaintiff, is, we think, non-existent. Therefore, it necessarily follows that this present complaint must be dismissed unless the Supreme Court has, in some decision or decisions rendered since the date of our earlier decision, extended the principles which it had previously announced with respect to the matter of equality of treatment of the races when engaged in interstate transportation.

We turn then to a consideration of whether any pertinent decisions have been rendered by the Supreme Court subsequent to our earlier decision. We find only two cases, namely, Morgan v. Commonwealth of Virginia, 328 U.S. 373, 66 S.Ct. 1050, 90 L.Ed. 1317, 165 A.L.R. 574, and Bob-Lo Excursion Co. v. Michigan, 333 U.S. 28, 68 S.Ct. 358, sufficiently related to invite attention. At the time of our previous opinion the Morgan case had been decided by the Supreme Court of Appeals of Virginia, 184 Va. 24, 34 S.E.2d 491, but the appeal therein to the Supreme Court was still undecided. As pointed out in our previous opinion, that case involved the validity of a Virginia statute, Code 1942, § 4097dd, and State court action to enforce the same, and did not involve, as does the case here,

the validity of the regulations of a common carrier. The Supreme Court reversed the State Court and held unconstitutional, as a burden on interstate commerce, the Virginia statute which required separation of the races in motor buses. This requirement was described by the Supreme Court in its opinion as follows (328 U.S. 373, at page 381, 66 S.Ct. 1050, at page 1055): "On appellant's journey, this statute required that she sit in designated seats in Virginia. Changes in seat designation might be made 'at any time' during the journey when 'necessary or proper for the comfort and convenience of passengers.' This occurred in this instance. Upon such change of designation, the statute authorizes the operator of the vehicle to require, as he did here, 'any passenger to change his or her seat as it may be necessary or proper.' An interstate passenger must if necessary repeatedly shift seats while moving in Virginia to meet the seating requirements of the changing passenger group. On arrival at the District of Columbia line, the appellant would have had freedom to occupy any available seat and so to the end of her journey."

In our consideration of the Morgan case in our earlier opinion, as that case then stood, we stated (63 F.Supp. 906, at pages 913, 914) that "it is not necessary to approach the present case from this aspect [the fact that Virginia's segregation laws were applicable alike to interstate as well as intrastate rail transportation], because, as we have said, the real question before us is not one of segregation, but of equality of treatment. Furthermore, the Commission in its opinion does not rely upon State statutes or decisions; and likewise, the railway company does not rely upon them. As a matter of fact, the Virginia statute could not be successfully relied upon in the present case because it does not, at least in terms, purport to embrace dining car service. * * *" Then, after quoting the Virginia statute, we said: "Note the above provisions, even if they could be said to embrace dining cars, have not been satisfied in the present case because nothing short of race segregation in separate cars, or in compartments 'divided by a good and substantial partition, with a door therein,' would satisfy those provisions."

That the Supreme Court in the Morgan case very definitely recognized the distinction between the two types of cases, namely, those involving the validity of a State statute and those involving the rule of a carrier requiring segregation of interstate passengers, is indicated by the following footnote, 328 U.S. on page 377, 66 S.Ct. on page 1053: "When passing upon the rule of a carrier that required segregation of an interstate passenger, this Court said, 'And we must keep in mind that we are not dealing with the law of a state attempting a regulation of interstate commerce beyond its power to make.' Chiles v. Chesapeake & Ohio R. Co., 218 U.S. 71, 75, 30 S.Ct. 667, 668, 54 L.Ed. 936, 20 Ann.Cas. 980." See also Simmons v. Atlantic Greyhound Corporation, D.C., 75 F.Supp. 166; Stamps v. Louisville & Nashville Railroad Co., 269 I.C.C. 789.

The Commission in its report now under review, clearly stated, we think, the distinction between the two types of cases in the following language (269 I.C.C. 73, at page 77): "Defendant's dining car regulations apply only to service in dining cars which cars are not permitted to leave its lines. They apply uniformly over defendant's entire railroad system, embracing approximately 8,000 miles of lines extending into all southeastern States. Their enforcement cannot in any circumstances result in disturbance to passengers by forcing them to change seats upon crossing State lines, a requirement of the Virginia statutes which the courts condemn as imposing an undue burden on interstate commerce."

We turn then to the only other case decided by the Supreme Court since our earlier opinion in this proceeding was rendered, which likewise appears pertinent but actually is not, to the present issue, namely, Bob-Lo Excursion Co. v. Michigan, supra. There, it was decided that a Michigan statute, Comp.Laws Supp.1940, § 17115-146 to 17115-148, prohibiting Negro segregation in all public service including transportation, was legally enforceable with respect to refusal of a Michigan corporation, engaged chiefly in the round-trip of pas-

sengers from Detroit to Bois Blanc Island, Canada, to sell a ticket to a Negro for transportation to the latter resort which was reserved for white people, because, although the Michigan corporation was engaged in foreign commerce, application of the Michigan law to appellant was held not to contravene the commerce clause of the Federal Constitution.

In its opinion in the Bob-Lo Excursion Company case, the Supreme Court distinguished Morgan v. Virginia, supra, and Hall v. Decuir, 95 U.S. 485, 24 L.Ed. 547, saying (333 U.S. 28, at pages 39, 40, 68 S. Ct. 358, at page 364): "The regulation of traffic along the Mississippi River, such as the Hall case comprehended and of interstate motor carriage of passengers by common carriers like that in the Morgan case, are not factually comparable to this regulation of appellant's highly localized business, and those decisions are not relevant here."

The even more recent decisions of the Supreme Court involving deed covenants prohibiting sales of realty to Negroes, Shelley v. Kraemer (McGhee v. Sipes), 334 U.S. 1, 68 S.Ct. 836; and Hurd v. Hodge (Urciolo v. Hodge), 334 U.S. 24, 68 S.Ct. 847, obviously have no relation, directly or indirectly, to the issue in the present case. Those decisions do not hold that race segregation in respect to deed covenants is forbidden. On the contrary, they recognize the legality of agreements to this effect. They merely hold that such agreements, although lawful, are not enforceable by court process. Thus, they have no relation to the principles governing the conduct of interstate transportation by common carrier.

Reliance is also placed by counsel for plaintiff upon Matthews v. Southern Railway System, 81 U.S.App.D.C. 263, 157 F.2d 609. There, the only issue was the correctness of the trial judge's charge to the jury in a race separation case. The Court of Appeals for the District of Columbia, in a footnote reference to the Morgan case, said (157 F.2d at page 610) it could see "no valid distinction between segregation in buses and in railroad cars." We believe that we have already addressed ourselves sufficiently to this point to indicate that, in our opinion, there is a very definite distinction from the aspect of dining car accommodations during railroad transportation.

To summarize and conclude: (1) Racial segregation of interstate passengers is not forbidden by any provision of the Federal Constitution, the Interstate Commerce Act or any other Act of Congress as long as there is no real inequality of treatment of those of different races. (2) Allotment of seats in interstate dining cars does not per se spell such inequality as long as such allotment, accompanied by equality of meal service is made and is kept proportionately fair. This necessity was recognized by the Commission in its report on which the order now approved by us is based, when it said (269 I.C.C. 73, at page 76): "Should the indicated trend continue, substantial equality of treatment may require the reservation of additional accommodations for Negroes in the future." To the argument that proportionate allotment of tables is only just and equitable so long as persons may find seats at a table assigned to their respective races, and fails to meet the equality test when there is any empty seat in the dining car which a person of either race is forbidden to occupy, suffice it to say that this argument denies the very premise from which we start, namely, that racial segregation is not, per se, unconstitutional. Since this is true, we fail to see that a situation such as that just referred to produces a result any more unjust or inequable from a legal approach,— which must be this Court's approach to the question,—than the no doubt common situation where both white and colored passengers may be kept waiting to secure seats at tables allotted to ther respective races, because, for the time being, every seat in the dining car may be occupied.

For the reasons herein set forth the complaint must be dismissed.

SOPER, Circuit Judge (dissenting).

Insofar as the opinion of the court sustains the Railroad Company's dining car regulations on the ground that they made adequate provision for the number of Negro passengers likely to apply for service,

I am constrained to dissent. The Railroad Company has found that less than 4 per cent. of its dining car patrons are Negroes, and it reserves 8 per cent. of the available space for their exclusive use. This arrangement on its face seems fair to the Negro race, but it is based on the erroneous assumption that the rights which the Fourteenth Amendment is designed to protect are racial rather than personal in their nature. The regulations set aside one table in the dining car exclusively for Negroes and ten tables exclusively for whites, and the result is that occasionally a member of one race is denied service which is then available to a member of the other. Whenever this occurs, the Railroad Company discriminates against one passenger in favor of another because of his race, and deprives him of equality of treatment, and it is no answer to say that the Railroad Company has taken reasonable precautions to prevent the occurrence. It is true that segregation of the races is lawful provided "substantial equality of treatment of persons traveling under like conditions" is accorded; but the right belongs to the individual and not to the race, and segregation must be abandoned, or at least temporarily suspended, whenever its enforcement deprives the individual of treatment equal to that accorded to any other person at the same time.

Segregation in railroad traffic may be maintained if there are sufficient accommodations for all; but a vacant seat may not be denied to a passenger simply because of his race. The decisions of the Supreme Court support this view. In McCabe v. Atchison, T. & S. F. R. Co., 1914, 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169, the court upheld an Oklahoma statute, 13 O.S. 1941 § 181 et seq., which required the Railroad Company to provide separate but equal accommodations for the two races in intrastate railroad travel, but struck down a section of the Act which permitted the carrier to provide sleeping cars, dining cars or chair cars to be used exclusively by either white or Negro passengers, separately but not jointly. It is not questioned that the meaning of this provision was that the carrier might provide these cars for white persons but need not provide similar accommodations for Negroes, because there were not enough Negroes seeking these accommodations to warrant the expense of providing them. Justice Hughes, in holding this section unconstitutional, said (235 U.S. at pages 161, 162, 35 S.Ct. at page 71): "This argument with respect to volume of traffic seems to us to be without merit. It makes the constitutional right depend upon the number of persons who may be discriminated against, whereas the essence of the constitutional right is that it is a personal one. Whether or not particular facilities shall be provided may doubtless be conditioned upon there being a reasonable demand therefor; but, if facilities are provided, substantial equality of treatment of persons traveling under like conditions cannot be refused. It is the individual who is entitled to the equal protection of the laws, and if he is denied by a common carrier, acting in the matter under the authority of a state law, a facility or convenience in the course of his journey which, under substantially the same circumstances, is furnished to another traveler, he may properly complain that his constitutional privilege has been invaded.".

It may be suggested that the McCabe case is distinguishable because in that case the Railroad Company made no provision for colored passengers desiring first class service, whereas the regulations under examination in the present case are designed to care for all colored passengers that may be reasonably expected to apply. The distinction, however, is one of degree and not of principle, for in both cases the arrangement is designed to take care of the demands of the race rather than those of the individual citizen. Moreover, in 1940, the Supreme Court in Mitchell v. United States, 313 U.S. 80, 61 S.Ct. 873, 85 L.Ed. 1201, reiterated the ruling that constitutional rights are personal and not racial, in a case where the carrier contemplated the probability that Pullman service would be demanded by Negroes, but made insufficient provision to meet the demand. Whenever that occurred, the court said, the Railroad Company was required to abandon the policy of segregation and seat the colored passenger in the car ordinarily reserved for whites. It had been the practice of the

Railroad Company to accommodate the occasional Negro applicant for a chair in a Pullman car by giving him a seat in a drawing room at the same rate as was charged for a seat in the body of the car, but to compel the passenger to take a place in an ordinary coach when no drawing room was available. Adopting the view of the Government which opposed the regulation, Chief Justice Hughes, speaking for the court, said (313 U.S. at pages 96, 97, 61 S.Ct. at page 878):

"The Government puts the matter succinctly: 'When a drawing room is available, the carrier practice of allowing colored passengers to use one at Pullman seat rates avoids inequality as between the accommodations specifically assigned to the passenger. But when none is available, as on the trip which occasioned this litigation, the discrimination and inequality of accommodation become self-evident. It is no answer to say that the colored passengers, if sufficiently diligent and forehanded, can make their reservations so far in advance as to be assured of first-class accommodations. So long as white passengers can secure first-class reservations on the day of travel and the colored passengers cannot, the latter are subjected to inequality and discrimination because of their race'. And the Commission has recognized that inequality persists with respect to certain other facilities such as dining-car and observation-parlor car accommodations.

"We take it that the chief reason for the Commission's action was the 'comparatively little colored traffic'. But the comparative volume of traffic cannot justify the denial of a fundamental right of equality of treatment, a right specifically safeguarded by the provisions of the Interstate Commerce Act. We thought a similar argument with respect to volume of traffic to be untenable in the application of the Fourteenth Amendment. We said that it made the constitutional right depend upon the number of persons who may be discriminated against, whereas the essence of that right is that it is a personal one. McCabe v. Atchison Topeka & Santa Fe R. Co., supra. While the supply of particular facilities may be conditioned upon there being

a reasonable demand therefor, if facilities are provided, substantial equality of treatment of persons traveling under like conditions cannot be refused. It is the individual, we said, who is entitled to the equal protection of the laws,—not merely a group of individuals, or a body of persons according to their numbers. Id. See, also, [State of] Missouri ex rel. Gaines v. Canada, 305 U.S. [337, at] pages 350, 351, 59 S.Ct. [232], 236, 237, 83 L.Ed. 208. And the Interstate Commerce Act expressly extends its prohibitions to the subjecting of 'any particular person' to unreasonable discriminations."

The same principle was again approved by the Supreme Court in the recent case of Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, which dealt with the validity of restrictive covenants in deeds designed to exclude Negroes from the ownership or occupancy of real property. The court held that covenants of this nature are unenforceable and, pointing out that the constitutional rule of equality is personal, declared that the denial of such a right to a Negro is not validated by the denial of the right under like circumstances to a white person. Chief Justice Vinson said 68 S.Ct. at page 846: "Respondents urge, however, that since the state courts stand ready to enforce restrictive covenants excluding white persons from the ownership or occupancy of property covered by such agreements, enforcement of covenants excluding colored persons may not be deemed a denial of equal protection of the laws to the colored persons who are thereby affected. This contention does not bear scrutiny. The parties have directed our attention to no case in which a court, state or federal, has been called upon to enforce a covenant excluding members of the white majority from ownership or occupancy of real property on grounds of race or color. But there are more fundamental considerations. The rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the individual. The rights established are personal rights. It is, therefore, no answer to these petitioners to say that the courts may also be induced to deny white persons rights of ownership and occupancy on grounds of

race or color. Equal protection of the laws is not achieved through indiscriminate imposition of inequalities."

The carrier in the pending case has undoubtedly made an earnest effort to meet the criticisms directed at its earlier regulation in the former opinion of this court, and consequently instances of discrimination on account of race are less likely to occur under the regulation now prevailing. Nevertheless that regulation must also be condemned because it occasionally permits discrimination against members of both races in the allotment of dining-room privileges; and the court should therefore hold that the practice of the carrier in segregating the races in its dining-cars must be suspended whenever its enforcement results in the denial to any individual of his constitutional right of equality of treatment.