## WILLIAMS v. CAROLINA COACH CO.

Civ. A. No. 1386.

United States District Court
E. D. Virginia, Richmond Division.

Nov. 18, 1952.

330

Hill, Martin & Robinson, Richmond, Va., for plaintiff.

Wicker, Baker & Shuford, Richmond, Va., for defendant.

STERLING HUTCHESON, Chief Judge.

This is another case involving the segregation of races on common carriers. Paradoxically, the legal question presented does not involve racial discrimination but this action is one involving Clause 3, Section 8, Article 1, of the Constitution of the United States, commonly referred to as the Commerce Clause.

This memorandum is intended to serve as findings of fact and conclusions of law under Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.A.

The plaintiff is a colored citizen of the State of North Carolina. He alleges that after purchasing a ticket entitling him to be transported from Norfolk, Virginia, to Spring Hope, North Carolina and return, as a passenger on a motor bus operated by the Carolina Coach Company, he boarded said bus at Spring Hope to begin his return trip and became a subject of interstate commerce.

When the plaintiff boarded the bus at Spring Hope there were a number of vacant seats, some to the rear of the one selected by him and some forward. Upon arrival at Rocky Mount, North Carolina, additional passengers of both white and colored races boarded the bus in a sufficient number to cause all the seats to be occupied and some of the passengers were required to stand, although it is not clear whether these were white or colored or some of both. Among the white passengers there was one with his leg in a cast. A seat next to the one occupied by the plaintiff was also occupied by a colored man. In undertaking to re-arrange the passengers the driver acting pursuant to a rule and regulation of the defendant requiring colored passengers to seat from the rear forward, and white passengers from the front to the rear, requested the plaintiff as well as the individual seated beside him, to change to the seat immediately back of the one in which they were sitting, it being the opinion of the driver and his superior that the above mentioned regulation gave to the driver the authority to arrange and rearrange the seating of passengers as the occasion required. The passenger seated beside plaintiff complied with the request but plaintiff declined to do so, stating that he was comfortable where he was. The request was repeated several times and substantially the same response was made by the plaintiff. The driver thereupon left the bus, telephoned the police station and requested that an officer be sent to the bus station. Shortly thereafter two officers of the Town of Rocky Mount appeared, one of whom entered the bus and the driver pointed out the plaintiff to the officer. The officer requested plaintiff to change his seat and when he again refused to do so, at the di-

rection of the officer he left the bus. On the platform the officer and the plaintiff were joined by the second officer and at their direction plaintiff entered the police car. The bus driver then gave to one of the police officers the unused portion of plaintiff's ticket to Norfolk and the officer later transmitted this ticket to the plaintiff. At the direction of the police officer a warrant was issued by a local Justice of the Peace, charging the plaintiff with violation of a statute of North Carolina requiring the segregation of members of white and colored races on common carriers. Plaintiff was detained at the police station for several hours until arrangements were made to post bond. Subsequently the criminal warrant was dismissed although in the meantime plaintiff had incurred expenses amounting to $101 in locating witnesses, employing counsel and loss of time from his work.

For the purpose of this case I think it clear that the removal and arrest of the plaintiff by the officers was instigated by the bus driver although he did not specifically request a warrant but merely requested the officers to undertake to prevail upon the plaintiff to change his seat. However, the fact is that he pointed out to the officers the plaintiff who was then in the status of one violating a state law. Whiteside v. Southern Bus Lines, 6 Cir., 177 F.2d 949.

It is to be borne in mind that unlike the case of Day v. Atlantic Greyhound Corporation, 4 Cir., 171 F.2d 59, 60, the gravamen of this complaint is not unlawful racial discriminatory practice but it is the alleged wrongful usurpation by the defendant of powers granted Congress by the several states.

In the Day case the United States Court of Appeals Fourth Circuit, used the following language:

"The most important legal question on this appeal is raised by the contention of the plaintiff that any rule of a common carrier which imposes racial segregation upon its passengers not only contravenes the principles of the common law, but violates the Four-

tcenth Amendment of the Federal Constitution. This question, however, is not open to debate in this court. It is foreclosed by binding decisions of the Supreme Court which hold that an interstate carrier has a right to establish rules and regulations which require white and colored passengers to occupy separate accommodations provided there is no discrimination in the arrangement. See Hall v. DeCuir, 95 U.S. 485, 24 L.Ed. 547; Chiles v. Chesapeake & Ohio R. Co., 218 U.S. 71, 30 S.Ct. 667, 54 L.Ed. 936, 20 Ann.Cas. 980. It is true that in more recent decisions, notably Morgan v. Com. of Virginia, 328 U.S. 373, 66 S.Ct. 1050, 90 L.Ed. 1317, 165 A.L.R. 574, and Bob-Lo Excursion Co. v. Michigan, 333 U.S. 28, 68 S.Ct. 358, [92 L.Ed. 455], the right of colored passengers in public vehicles to fair and reasonable treatment has been sustained, and the limits to the power of the states to enact segregation statutes have been defined. In Morgan v. Virginia, for example, it was held that a Virginia statute which requires motor carriers to allocate seats to white and colored passengers so as to separate the races, and requires passengers, if necessary, to change their seats repeatedly in order to comply with the allocation, imposes an undue burden on interstate commerce and therefore violates Article 1, § 8, Cl. 3 of the Federal Constitution. Nevertheless, in this very case the court pointed out that it was dealing with a state statute and not with a regulation of the carrier; and the court referred specifically to its earlier decision in Chiles v. Chesapeake & Ohio R. Co., supra, in the following language, 328 U.S. 373, 377, Note 12, 66 S.Ct. 1050, 1053, 90 L.Ed. 1317, 165 A.L.R. 574: 'When passing upon a rule of a carrier that required segregation of an interstate passenger, this Court said, "And we must keep in mind that we are not dealing with the law of a state attempting a regulation of interstate commerce beyond its power to make." Chiles v. Chesapeake & Ohio

R. Co., 218 U.S. 71, 75, 30 S.Ct. 667, 668, 54 L.Ed. 936, 20 Ann.Cas. 980.' Since the Chiles case expressly sustained the power of an interstate carrier to issue a segregation regulation, provided that it is not discriminatory, our inquiry must be limited to the nature of the regulation enforced in the pending case, and we may not inquire whether the segregation of the races in public vehicles is in itself inherently discriminatory."

Following this language the Court in that case referred to the fact that the bus company had on file with the Interstate Commerce Commission, pursuant to requirements of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., and pursuant to the regulation of the Commission, regulations of the bus company dealing with the segregation of passengers. The same situation applied in the instant case. The Court, after expressing the opinion that a regulation of the course of conduct on the part of a carrier involving the repeated shifting of seats by colored passengers would amount to discriminatory treatment, pointed out that that was not the case there since the plaintiff Day could have made the change without substantial inconvenience and used the following language:

"The adoption of a reasonable regulation by an interstate carrier for the segregation of passengers does not violate the law as laid down by the Supreme Court; * * *."

As in the Day case, the evidence shows that the plaintiff in the case at bar could have made the shift without substantial inconvenience either to himself or to other passengers. However, as before mentioned, this case is not based upon an alleged violation of the Fourteenth Amendment to the Constitution but involves the assertion of rights under Article 1, Clause 3, Section 8 of the Constitution dealing with commerce.

In this connection it may not be amiss to point to the fact that while the constitutional provision declares that "Congress shall have Power * * * To regulate Commerce * * *", Congress has not seen fit to enact legislation pertinent to the facts here disclosed, although such legis-

lation has been considered. However, the constitutional provision has been the subject of judicial interpretation upon a number of occasions with results both interesting and far-reaching in consequences.

In Hall v. DeCuir, 95 U.S. 485, 24 L.Ed. 547, an act of the legislature of Louisiana prohibiting the segregation of races on common carriers was considered at great length and the principle laid down that such a statute enacted by a state is a regulation of interstate commerce and unconstitutional and void. In that opinion the Court held that the carrier may make rules and regulations concerning the accommodations of passengers provided they are reasonable, using the following language:

"This power of regulation may be exercised without legislation as well as with it. By refraining from action, Congress, in effect, adopts as its own regulations those which the common law or the civil law, where that prevails, has provided for the government of such business, and those which the States, in the regulation of their domestic concerns, have established affecting commerce, but not regulating it within the meaning of the Constitution. In fact, congressional legislation is only necessary to cure defects in existing laws, as they are discovered, and to adapt such laws to new developments of trade. As was said by Mr. Justice Field, speaking for the court in Welton v. The State of Missouri, 91 U.S. [275] 282, [23 L.Ed. 347] 'inaction (by Congress) * * * is equivalent to a declaration that inter-state commerce shall remain free and untrammelled.' Applying that principle to the circumstances of this case, congressional inaction left Benson at liberty to adopt such reasonable rules and regulations for the disposition of passengers upon his boat, while pursuing her voyage within Louisiana or without, as seemed to him most for the interest of all concerned. The statute under which this suit is brought, as construed by the State court, seeks to take away from him that power so long as he is within Louisiana; and while recog-

nizing to the fullest extent the principle which sustains a statute, unless its unconstitutionality is clearly established, we think this statute, to the extent that it requires those engaged in the transportation of passengers among the States to carry colored passengers in Louisiana in the same cabin with whites, is unconstitutional and void. If the public good requires such legislation, it must come from Congress and not from the States."

In his concurring opinion Mr. Justice Clifford used the following language:

"Governed by the laws of Congress, it is clear that a steamer carrying passengers may have separate cabins and dining saloons for white persons and persons of color, for the plain reason that the laws of Congress contain nothing to prohibit such an arrangement."

In Chiles v. Chesapeake & O. Railway Company, 218 U.S. 71, 30 S.Ct. 667, 54 L. Ed. 936, the plaintiff, while a passenger, with a ticket to another state, was removed for refusing to occupy a car set apart for colored persons. The case involved not a state statute but the rules and regulations of the railroad company. It was held that a reasonable regulation requiring the separation of races, with equal accommodations for both, was valid. On page 77 of 218 U.S., on page 669 of 30 S.Ct. the Court used the following language:

"Regulations which are induced by the general sentiment of the community for whom they are made and upon whom they operate cannot be said to be unreasonable."

The Court referred to Hall v. DeCuir, supra, and Plessy v. Ferguson, 163 U.S. 537, 540, 16 S.Ct. 1138, 41 L.Ed. 256.

The case of Mitchell v. United States, 313 U.S. 80, 61 S.Ct. 873, 85 L.Ed. 1201, involved equality of accommodations and I do not find it authority either for or against a rule requiring segregation of passengers.

Then in Morgan v. Com. of Virginia, 328 U.S. 373, 66 S.Ct. 1050, 1052, 90 L.Ed. 1317, the Supreme Court had before it the

question of the constitutionality of an act of the State of Virginia, Code 1942, § 4097z et seq., requiring "all passenger motor vehicle carriers, both interstate and intrastate, to separate without discrimination the white and colored passengers in their motor buses so that contiguous seats will not be occupied by persons of different races at the same time."

There were two assignments of error, the first being that the decision of the state court upholding the statute is repugnant to Clause 3, Section 8, Article 1 of the Constitution, and the second is the holding of the Court that powers reserved to the states by the Tenth Amendment include the power to require an interstate motor passenger to occupy a seat restricted for use of members of his race.

The Court said:

"Actually, the first question alone needs consideration for if the statute unlawfully burdens interstate commerce, the reserved powers of the state will not validate it."

After asserting the principle that state legislation which materially affects interstate commerce is invalid, even where Congress has not acted, the Court came to the conclusion that the statute "burdens interstate commerce or so infringes the requirements of national uniformity as to be invalid", making reference to the fact that conditions vary between northern and western states, the industrial states and the states of the deep south, all with varying densities of white and colored races in certain localities. Mr. Justice Reed then used the following language:

"As there is no federal act dealing with the separation of races in interstate transportation, we must decide the validity of this Virginia statute on the challenge that it interferes with commerce, as a matter of balance between the exercise of the local police power and the need for national uniformity in the regulations for interstate travel. It seems clear to us that seating arrangements for the different races in interstate motor travel require a single, uniform rule to promote and protect national travel. Consequently, we hold the Virginia statute in controversy invalid."

In his concurring opinion Mr. Justice Frankfurter said:

"The imposition upon national systems of transportation of a crazy-quilt of State laws would operate to burden commerce unreasonably, whether such contradictory and confusing State laws concern racial commingling or racial segregation. This does not imply the necessity for a nationally uniform regulation of arrangements for passengers on interstate carriers. Unlike other powers of Congress * * * the power to regulate commerce does not require geographic uniformity. Congress may devise a national policy with due regard to varying interests of different regions. * * * The States cannot impose diversity of treatment when such diverse treatment would result in unreasonable burdens on commerce. But Congress may effectively exercise its power under the Commerce Clause without the necessity of a blanket rule for the country."

Mr. Justice Black filed a concurring opinion which will be referred to later.

Thereafter, the United States Court of Appeals, Sixth Circuit, had before it in 1949 the case of Whiteside v. Southern Bus Lines, supra. In that case the plaintiff purchased a ticket in St. Louis, Missouri, for transportation to Paducah, Kentucky, via Cairo, Illinois. Upon arrival at Wickliffe, Kentucky, she was requested to move to another seat in the rear of the bus on account of her race. Upon her refusal to move the bus operator procured the assistance of a police officer and the passenger was ejected from the vehicle. In her action the plaintiff relied upon the Fifth and Fourteenth Amendments to the Constitution and the Commerce Clause. After making reference to the many cases, referred to as "legion", dealing with the authority of states to compel or prohibit the segregation of races in consideration of the Fourteenth Amendment, the Court expressed the view that no useful purpose would be served by their citation or analysis. Stating that

it conceived itself constrained in large measure by the doctrine of *stare decisis,* the Court declined to reach a decision by consideration of cases which do not dispose of the present problem but may seem to indicate a new approach to the problem of racial segregation. It stated further that if Chiles v. Chesapeake & O., supra, and Plessy v. Ferguson, supra, are to be disregarded, it may not be by that Court, which then used the following language [177 F.2d 951]:

"We confine ourselves, therefore, to the question whether the regulation of the appellee, as enforced by it upon the appellant while an interstate passenger under the asserted sanction or compulsion of Kentucky law, constitutes a burden upon interstate commerce, and in the narrow compass within which we may, with confidence, arrive at decision, we consider mainly two adjudications of the Supreme Court of the United States, both controlling upon us, namely, the early case of Hall v. DeCuir, 95 U.S. 485, 24 L.Ed. 547, and the comparatively recent case of Morgan v. [Com. of] Virginia, 328 U.S. 373, 66 S.Ct. 1050, 90 L.Ed. 1317, 165 A.L.R. 574, in the first of which a Louisiana statute inhibiting segregation and in the second a Virginia statute compelling it, were both declared invalid as constituting a burden upon interstate commerce, the regulation of which was entrusted solely to the Congress and so was beyond the power of the states to undertake, in the circumstances here involved."

After discussing the Morgan case, the Court referred to the fact that Kentucky has no statute compelling the segregation of races similar to that of Virginia, but pointed to long-settled usage and custom in Kentucky, crystallized into unwritten law. The Court then said:

"In any event, the present appellee defends its regulation by the sanction not only of local custom, but of applicable Kentucky law."

The Court analyzed Simmons v. Atlantic Greyhound Corporation, D.C., 75 F.Supp. 166, and Henderson v. Interstate Commerce Commission, D.C., 80 F.Supp. 32, then on appeal to the Supreme Court, Henderson v. U. S., 339 U.S. 816, 70 S.Ct. 843, 94 L.Ed. 1302. Incidentally, the Court pointed to the fact that in the Simmons case a defense was offered concerning the ejection of the plaintiff by the joint efforts of an officer and the bus driver, stating that since the driver invoked the exercise of authority the defendant would still be liable for having procured the ejection indirectly. The opinion closed, as follows:

"We indicate no view as to the reasonableness or necessity of the challenged regulation under conditions which exist in Kentucky, nor as to its validity under state law when applied to local traffic. We hold that as here applied to a passenger traveling on an interstate journey upon an interstate conveyance, it constitutes a burden upon interstate commerce and furnishes no immunity to the appellee for damages which may flow from its enforcement. We are not unmindful of the fact that the district judge sitting as a trier of the facts, found that the ejection of the appellant was caused without the use of excessive force. While this may bear upon the question of damages it does not avoid liability."

Henderson v. United States, 339 U.S. 816, 70 S.Ct. 843, 844, 94 L.Ed. 1302, involved the question of whether the rules and practices of the Southern Railway with respect to segregation on dining cars violate Section 3(1) of the Interstate Commerce Act. In the language of the Court:

"That section makes it unlawful for a railroad in interstate commerce 'to subject any particular person, * * * to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: * * *'".

In the opinion by Mr. Justice Burton, who dissented in the Morgan case, the Court held that the rules and practices involved violate the Act.

The Court said that its decision was largely controlled by that in Mitchell v. United States, supra, and used the following language:

"Since § 3(1) of the Interstate Commerce Act invalidates the rules and practices before us, we do not reach the constitutional or other issues suggested."

Then in 1951 the United States Court of Appeals, Fourth Circuit, rendered its opinion in Chance v. Lambeth and Atlantic Coast Line Railroad Company, Incorporated, 186 F.2d 879, 881, which was an appeal from a decision of this Court. In that case the plaintiff was a passenger on the defendant railroad company, holding a round-trip ticket from Rocky Mount, North Carolina, to Philadelphia, Pennsylvania. At the time here referred to he was on his return trip, having traveled from Philadelphia to Washington on the Pennsylvania Railroad and there changed to the Richmond, Fredericksburg and Potomac Railroad to Richmond, and then to the Atlantic Coast Line Railroad, for his destination. When the train left Washington, three passenger coaches first in line were designated for Negro passengers and the next two for white. The accommodations were equal. The three forward coaches were crowded at Washington and the plaintiff was directed to go to the rear, where he found a seat in the last coach, which was occupied from Washington to Richmond by both white and colored persons. At Richmond the passengers were segregated and the trainmen directed the white persons in the first three coaches to go to the rear and the colored persons in the last two coaches to go forward. The plaintiff refused to move and was told that if he persisted in such refusal he would be put off the train and the police would be called because the regulations of the company required segregation of the races. After the train left Richmond, local police officers at Emporia were requested by the railroad to meet the train, which they did and took the plaintiff off when he was pointed out by the conductor. His ticket was returned to him by the conductor and he was taken by the police officers to the police station, where he was charged with disorderly conduct. The charge of disorderly conduct was later withdrawn.

After stating that the Mitchell and Henderson cases held that discrimination against colored passengers with respect to Pullman seats or dining car service was held to violate Paragraph 1 of Section 3 of the Interstate Commerce Act, the Court of Appeals, Fourth Circuit, stated:

"The regulation and its enforcement in this case is attacked upon a number of grounds but we find it necessary to consider only one, namely, that it unlawfully burdens interstate commerce and is therefore repugnant to Clause 3, Section 8 of Article 1 of the Federal Constitution which empowers Congress to regulate commerce among the several states. Strong light has been thrown by decisions of the Supreme Court, some of recent date, upon the validity of state laws and railroad regulations which require the segregation of the races or discriminate between them in public conveyances in this country."

The Court then cited Hall v. DeCuir, supra, and Morgan v. Virginia, supra, previously discussed. As has been seen, both of those cases deal with state statutes.

The Court then again refers to Mitchell v. United States, supra, and Henderson v. United States, supra, where it said:

"In the last mentioned cases the court did not reach certain constitutional questions suggested by the complainant, but in all the cases, whether the decision was based upon a violation of a provision of the constitution or of a statute of the United States, the problem under consideration was the standard of conduct to be observed by interstate carriers in dealing with members of the traveling public."

Continuing the opinion used the following language:

"We reach the conclusion that the railroad regulation now before us must be declared invalid. Not only does its enforcement interfere with the uniformity which should characterize interstate carriage from one end of the route to the other, but its irregular enforcement for the convenience of the carrier, dependent upon the number of passengers and the character of accommodations which they purchase, adds to

the burden upon the traffic by increasing the confusion and discomfort of the passengers. When white and colored passengers are permitted to ride together for part of their journey through the State of Virginia, and then are compelled to separate and change cars, and when passengers in coaches are segregated on account of race while passengers in Pullman and dining cars are permitted to ride together irrespective of race, the burden upon interstate commerce is as clearly manifest as that imposed by the statute of Virginia which was invalidated in the Morgan case. It is true that the regulation of the carrier was not enacted by state authority, although the power of the state is customarily invoked to enforce it; but we know of no principle of law which requires the courts to strike down a state statute which interferes with interstate commerce but to uphold a railroad regulation which is infected with the same vice."

The Court then proceeded to refer to Whiteside v. Southern Bus Lines, supra, stating:

"The circumstances of the present case more nearly resemble those considered (there), with which we are in accord. In that case the court held invalid, as a burden upon interstate commerce the regulation of a bus company requiring colored people to be loaded in the rear of the bus in the course of an interstate journey."

■ After reviewing the cases referred to it is my conclusion that this case is controlled by the Chance case, decided by the Fourth Circuit, which appears directly in

point. The only distinction which I can draw is that Chance boarded the train at a point where segregation is not required by rule or regulation, for travel through a state and destination in another state where segregation is required. In the instant case the plaintiff's place of departure and destination were in separate states, in both of which segregation was required by company rules and regulations.

While in his opinion in the Morgan case Mr. Justice Frankfurter pointed to the fact that under the Commerce Clause Congress might devise a national policy having regard to varying interests of different geographic regions, it would appear that the courts have not deemed it appropriate to be guided by such considerations.[1] Upon the contrary the sole test to be applied by the Courts appears to be whether the commerce involved is moving between different states. This is emphasized by repeating the language of the Supreme Court in the [2] Henderson case and the language of the United States Court of Appeals, Fourth Circuit, in the [3] Chance case.

If such regulation issued by a railroad is invalid it necessarily follows that its adoption by a bus company would not make it valid.

■ As has been said the so-called Commerce Clause has been extensively discussed and interpreted by the Courts. It doubtless will be the subject of further interpretation in time to come. Conflicting views have been and, no doubt, will be voiced. However, when called upon to decide a case this Court must follow the law as laid down by those Courts whose decisions are controlling.

1. See dissenting opinion by Mr. Justice Burton, 328 U.S. at page 389, 66 S.Ct. at page 1060.

2. "That section makes it unlawful for a railroad in interstate commerce 'to subject any particular person, * * * to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: * * *'" [339 U.S. 816, 70 S.Ct. 844.]

3. "We reach the conclusion that the railroad regulation now before us must be

declared invalid. * * *" [186 F.2d 882.]
and
"* * *. It is true that the regulation of the carrier was not enacted by state authority, although the power of the state is customarily invoked to enforce it; but we know of no principle of law which requires the courts to strike down a state statute which interferes with interstate commerce but to uphold a railroad regulation which is infected with the same vice."

In discussing whether it should base its decision in part upon public policy of the United States as evidenced in recent Supreme Court decisions and thereby reappraise the scope of certain constitutional provisions, the United States Court of Appeals, Sixth Circuit, in the Whiteside case said [177 F.2d 950]:

"If this is to be done, however, it must be by judicial authority superior to ours, for we conceive ourselves still constrained, in large measure, by the doctrine of *stare decisis*, however that doctrine may be denied its full impact upon highest authority in constitutional cases."

The force of this reasoning is aptly emphasized in the concurring opinion of Mr. Justice Black in the Morgan case [328 U.S. 373, 66 S.Ct. 1058], when he wrote:

"The Commerce Clause of the Constitution provides that 'Congress shall have power * * * To regulate commerce * * * among the several States.' I have believed, and still believe that this provision means that Congress can regulate commerce and that the courts cannot. But in a series of cases decided in recent years this Court over my protest has held that the Commerce Clause justifies this Court in nullifying state legislation which this Court concludes imposes an 'undue burden' on interstate commerce. I think that whether state legislation imposes an 'undue burden' on interstate commerce raises pure questions of policy, which the Constitution intended should be resolved by the Congress.

"Very recently a majority of this Court reasserted its power to invalidate state laws on the ground that such legislation put an undue burden on commerce. (Cases cited.) I thought then, and still believe, that in these cases the Court was assuming the role of a 'super-legislature' in determining matters of governmental policy. (Cases cited.)

"But the Court, at least for the present, seems committed to this interpretation of the Commerce Clause. * * *"

And further:

"So long as the Court remains committed to the 'undue burden on commerce formula,' I must make decisions under it. * * *"

■ No useful purpose could be served by prolonging this discussion of either the principles involved or the law applicable. In the present state of the law the Courts whose decisions are binding upon this Court have spoken. The pronouncements of those Courts are clear. The regulation in question, they hold, imposes an undue burden upon interstate commerce. When undue burden upon interstate commerce is caused by a regulation and Congress has not exercised the power conferred upon it by the Constitution, such regulation must be declared invalid by the Courts. Chance v. Lambeth, supra.

It follows that judgment for the plaintiff should be entered in this case as hereafter provided.

This leaves for determination the question of damages. From the evidence it appears that the plaintiff has incurred expenses amounting to approximately $101. No other damages have been shown excepting some personal inconvenience. However, there is a claim for exemplary or punitive damages.

■■ In considering the claim for exemplary damages it should be said that no undue force was used nor was any actual hostility or animosity toward the plaintiff indicated by the evidence. To justify an award of exemplary damages under such facts it would be necessary that facts or circumstances existed showing an unreasonable or willful disregard on the part of the defendant of the known rights of the plaintiff. Considering the uncertain state of the law which has prevailed upon the subject during recent years it is my conclusion that no grounds have been shown for the allowance of exemplary damages against the defendant.

■ It is my opinion that there should be an award to the plaintiff for compensatory damages in the following amounts: $151 on

the first count of the complaint charging unlawful ejectment, and $100 on that portion of the second count charging false arrest, making a total award in the amount of $251.

Upon consideration of the facts of the case it is my conclusion that they do not show the elements necessary to sustain that portion of the complaint alleging malicious prosecution. Accordingly, I find for the defendant upon that portion of the second count where malicious prosecution is alleged.