John R. LEWIS, Paul E. Brooks, Lucretia R. Collins, Rudolph Graham, Catherine Burks, Matthew Petway, Ralph D. Abernathy, and others similarly situated, Plaintiffs,

v.

THE GREYHOUND CORPORATION; Capital Motor Lines; Continental Crescent Lines, Inc.; Earl James, L. B. Sullivan, and Frank Parks, individually and as members of the Board of Commissioners of the City of Montgomery, Alabama; and Goodwin J. Ruppenthal, individually and as Chief of Police of the City of Montgomery, Alabama; Mac-Donald Gallion, individually and as Attorney General of the State of Alabama; and C. C. (Jack) Owen, J. S. Foster and Sibyl Pool, individually and as members of the Alabama Public Service Commission; and Mac Sim Butler, individually and as Sheriff of Montgomery County, Alabama, Defendants, George Smith, Joseph Charles Jones, Wyatt T. Walker, Bernard Lee, Fred L. Shuttlesworth and Clyde Carter; William S. Coffin, John Maguire, David Swift and Gaylord Noice, Intervenors.

Civ. A. No. 1724–N.

United States District Court
M. D. Alabama, N. D.
Nov. 1, 1961.

Fred Gray, S. S. Seay, Jr., Charles S. Conley, Montgomery, Ala., Louis H. Pollak, New Haven, Conn., and Jack Greenberg, New York City, for plaintiffs and intervenors.

Hill, Hill, Stovall & Carter, Montgomery, Ala., for The Greyhound Corp., Capital Motor Lines, and Continental Crescent Lines, Inc.

Calvin M. Whitesell, Montgomery, Ala., for Earl James, L. B. Sullivan, Frank Parks, and Goodwin J. Ruppenthal, MacDonald Gallion, Montgomery, Ala., (pro se,) C. C. (Jack) Owen, J. S. Foster, and Sibyl Pool.

Hill, Robison & Belser, Montgomery, Ala., for Mac Sim Butler.

Hartwell Davis, U. S. Atty., Montgomery, Ala., John Doar, Atty., U. S. Dept. of Justice, Washington, D. C., amici curiae.

JOHNSON, District Judge.

This case is now submitted upon the several issues made up by the pleadings and the proof. Upon consideration of the evidence, consisting of the oral testimony of several witnesses and the exhibits thereto, this Court, as required by Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.A., makes the appropriate and necessary findings and conclusions, embodying the same in this Memorandum Opinion.

In this action the plaintiffs seek to enjoin the named defendants from continuing to pursue a policy, practice, custom or usage of segregating plaintiffs and members of their class on public interstate and intrastate motor carriers and in facilities and services of bus terminals located in the City of Montgomery and in other cities within the Middle District of Alabama. Plaintiffs also seek relief from interference with the exercise of their constitutionally protected rights to ride public interstate and intrastate carriers and use terminal facilities and services without discrimination because of race, and further seek relief against arrests, harassment, intimidation, threats and coercion for the purpose of interfering with plaintiffs' exercise of such constitutionally protected rights.

The events leading up to the filing of this action were as follows:

A serious riot occurred at the Greyhound bus station in Montgomery, Alabama, on May 20, 1961. This incident occurred after an interracial group, known as "freedom riders," arrived in Montgomery with the announced purpose of testing the bus facilities in Montgomery to determine whether the facilities could be used without any discrimination on account of race or color.

There was a crowd around the bus station as the bus arrived. After the bus parked to unload its passengers, the Greyhound bus driver announced over the loud-speaker system, "Here comes the 'freedom riders' to tame the South."

Some of the crowd then attacked the "freedom riders." General disorder broke out and during the following two hours a number of "freedom riders" and innocent Montgomery Negroes were injured by the mob. The police were not on the scene at the time the bus arrived.[1]

On May 19, 1961, in an action brought by the Attorney General of Alabama, one of the judges of the Circuit Court of

1. A more detailed discussion of the facts surrounding the May 20, 1961, riot may be found in this Court's opinion in United States v. U. S. Klans, et al., No. 1718-N, D.C., 194 F.Supp. 897, 901. In that case, this Court specifically found "that the Montgomery Police Department * * * willfully and deliberately failed to take measures to ensure the safety of the students and to prevent unlawful acts of violence upon their persons. This lack of protection on the part of the city police of Montgomery continued even after the arrival of the bus." The Court's order of June 2, 1961, restrained and enjoined the Montgomery Police Department from "willfully failing to provide police protection for persons traveling in interstate commerce in and through Montgomery, Alabama."

Montgomery County, Alabama, issued a broad ex parte injunction [2] against the "freedom riders," and on May 20, 1961, the same judge issued a contempt citation against twenty of the "freedom riders"—most if not all of whom were on the bus that arrived at the Montgomery bus station just before the riot—charging them with a willful violation of the injunction.

The Attorney General of Alabama was at the Montgomery city police station when he received information that the bus was arriving in Montgomery. He went to the bus station and "served" a copy of the state court injunction on one of the plaintiffs who had already been beaten by the members of the mob.

Limited martial law was declared in Montgomery on the night of May 21, 1961. On May 24, the "freedom riders" who had arrived on the 20th went to the Trailways bus station in Montgomery, were served at the white lunch counter, boarded a Trailways bus and departed for Jackson, Mississippi. They were accompanied by a heavy convoy of national guardsmen.

On May 25, ten individuals, including both whites and Negroes,[3] were arrested by Montgomery County Sheriff Mac Sim Butler at the white lunch counter in the Trailways Bus Terminal in Montgomery on charges of breach of the peace and conspiracy. These arrests were made by the sheriff under specific directions from the National Guard Commander, General Graham. Prior to their arrests, some of them had purchased tickets to Jackson, Mississippi. The group was taken to and confined in the jail.[4]

2. The petition in the Attorney General's suit alleged that: "The conduct of said persons traveling to and entry into the State of Alabama is such conduct calculated to provoke breaches of the peace throughout the State of Alabama; that such conduct threatens the safety, peace, and tranquility of the people of the State of Alabama; and further that such conduct has already resulted in serious breaches of the peace * * *."

The complaint elaborated incidents of violence which had recently occurred in connection with freedom rides, including the burning of one bus within the state, and several violent incidents in Birmingham requiring the local police to "take said persons (i. e., freedom riders) into protective custody and causing said persons to leave the State of Alabama in order to prevent further violence or bloodshed." The petition further alleged that the State had "no other adequate remedy to prevent irreparable injury to persons or property * * *." The state court issued an injunction phrased in very broad terms:

" * * * The respondents and others identified in said petition, its officers, agents, members, employees, servants, attorneys, followers, and all other persons in active concert or participation with respondents are hereby enjoined and restrained from continuing any acts designated in the petition, particularly the entry into and travel within the State of Alabama, (and engaging in the so-called 'Freedom Ride' and other acts or conduct calculated to provoke breaches of the peace within the State of Alabama) and which act or conduct threaten the safety, peace, and tranquility and general welfare of the people of the State of Alabama."

3. Seven of this group had come to Montgomery on May 24, after learning of the events in Montgomery, Alabama. These seven were not part of the original "freedom riders"; in fact, two of the seven joined the group by chance in Atlanta. Several of the group were white professors of religion at New England colleges —one of whom was a native of Montgomery, Alabama.

4. A typical warrant filed against intervenors charged that:

"Fred L. Shuttlesworth did disturb the peace of others by violent, profane, indecent, offensive or boisterous conduct or language or by conduct calculated to provoke a breach of the peace in that he did come into Montgomery, Alabama, which was subject to martial rule and did wilfully and intentionally attempt to test segregation laws and customs by seeking service at a public lunch counter with a racially mixed group, during a period which it was necessary for his own safety for him to be protected by military and police personnel and when the said lunch counter building was surrounded by a large number of hostile citizens of Montgomery."

It also charged that "Fred L. Shuttlesworth did meet with two or more per-

This case was filed on May 25, 1961, by seven Negro citizens, five of whom were "riders" under injunction issued by the state court. The other two Negroes are residents of Montgomery.

The plaintiffs ask for injunctive relief against racial segregation on interstate and intrastate buses and in bus terminal facilities in the State of Alabama.[5] They also request relief against enforcing segregation by means of signs, arrests and other forms of harassment. Finally, they ask for injunctive relief against the enforcement of the state court injunction, including contempt proceedings.

On May 26, 1961, the ten persons arrested on May 25 at the Trailways Bus Terminal were granted leave to intervene. The supplemental complaint and complaint in intervention asked the Court to enjoin the state criminal prosecutions which were then pending in Montgomery County against the intervenors.

The plaintiffs assert three legal bases for relief. First, they assert that the defendants maintain and enforce a policy, practice, custom and usage of segregation in buses and bus terminal facilities and that the complained of policy, practice, custom and usage being under color of state law violates the equal protection and due process clauses of the Fourteenth Amendment. Second, they urge that they are being subjected to unjust discrimination in interstate motor carrier transportation contrary to the terms of 49 U.S.C.A. § 316(d). Third, they assert that the complained of conduct constitutes an undue and unreasonable burden upon interstate carriers in contravention of the "commerce clause" of the Constitution (Article I, Section 8). In addition to these three general bases for relief, plaintiffs contend that the state court injunction and the specific arrests and threatened prosecutions of certain of the plaintiffs contravene the order of this Court entered on June 19,

1956, in the case of Browder v. Gayle, No. 1147–N, D.C., 142 F.Supp. 707, enjoining racial segregation in the operation of the Montgomery City Lines, an intra-city bus transportation company operating in Montgomery.

The decree in Browder v. Gayle, D.C., 142 F.Supp. 707, does not dispose of the issues. That case involved the constitutionality of certain statutes and ordinances requiring the segregation of the white and colored races on motor buses which operated within the City of Montgomery. The decree was designed and intended to cope with a situation involving a local intra-city bus line where terminal facilities were not involved.

Much of the proof dealt with the events which occurred in Montgomery during the five-day period May 20–25, 1961. The relevancy of the events of that period is that they show, and show conclusively, that segregated use of bus terminal facilities in Montgomery, Alabama, was then an established practice.

Standing alone, the arrests on May 25 of the intervenors and the mob violence at the Greyhound Bus Terminal on May 20 do not in and of themselves establish that the segregation practiced in the terminals was the result of a policy by the defendants; however, the actions of some of these defendants (and others) and the lack of action by state and city officials and particularly the testimony of General Graham that the disturbances were a reaction to an invasion of a settled social custom, compel this Court to conclude that prior thereto, there was segregation—by custom, practice and usage—within the bus terminals of the City of Montgomery.

Each of the defendants denies that he is *enforcing* the policy, practice, custom and usage alleged by the plaintiffs. It is significant, however, that none of the defendants specifically denies the existence of such policy and practice. As a

sons to commit a breach of the peace or to do an unlawful act." These charges were based upon Title 14, § 119(1) (disorderly conduct) and Title 14, § 407 (unlawful assembly) of the Code of Alabama.

5. Prior to the trial, the relief sought was limited to the Middle District of Alabama by amendment of the complaint.

matter of fact, the defendants Capital Motor Lines and Continental Crescent Lines, Inc., admit in their answers that throughout Alabama they maintain separate facilities in their terminals for the white and Negro races and that signs are posted in the terminals indicating which facilities are for the use of each race. The other defendant motor carrier, The Greyhound Corporation, while also specifically denying in its answer that it is *enforcing* segregation, is silent on whether it maintains separate facilities for the two races in its terminals or utilizes facilities where segregation is practiced. The significance of this silence is underlined by the statements of Greyhound's terminal manager in Montgomery. In his deposition the manager conceded that the terminal was constructed in 1951 with duplicate facilities for the separate use of the white and colored races; that as recently as the early part of this year signs were posted in the terminal designating the particiular facilities to be used by each race; and that until at least May 24, 1961, the facilities were in fact used on a segregated basis.

Based on all of the testimony, the Court must conclude that Greyhound and the other defendant bus companies have been maintaining and utilizing separate facilities for the use of the two races in their terminals and other such facilities located in the Middle District of Alabama.

The contention of the defendant carriers that they are not *enforcing* segregation in the separate facilities which they maintain or utilize is not a sufficient answer to a charge of a violation of 49 U.S.C.A. § 316(d), which prohibits them from subjecting any persons to "any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever." Both the Interstate Commerce Commission and the federal courts have held that the maintenance of separate facilities for the

two races constitutes unjust discrimination even though the use is not strictly enforced. NAACP v. St. Louis-San Francisco Railway, 397 I.C.C. 335 (1955); Baldwin v. Morgan, 287 F.2d 750 (5th Cir., 1961). Accordingly, the plaintiffs are entitled to relief against the carriers by virtue of the provisions of the Motor Carriers Act, and such relief is not dependent on whether or not the existing policy of providing separate facilities involves state action.

On September 22, 1961, the Interstate Commerce Commission *unanimously* adopted new regulations dealing with discrimination in the operation of interstate motor carriers. Part of these regulations dealt with terminal facilities. They prohibit interstate bus companies from *using* segregated terminal facilities. These regulations are clear, concise, and merely reiterate the laws as explained in Boynton v. Commonwealth of Virginia, 364 U.S. 454, 81 S.Ct. 182, 5 L.Ed.2d 206. Accordingly, the injunction that will be issued in this case will be framed in the language of the regulations. Obviously, the injunction will apply to facilities owned or controlled by the bus companies.[6] But, it will also cover facilities used by the bus companies as an integral part of their operations. So that there will be no misunderstanding, this Court's order does not apply "to every independently operated roadside restaurant at which a bus stops solely to pick up or discharge occasional passengers, or to every independently operated corner drug store which sells tickets for a motor carrier." However, "if in addition to selling tickets, the agent offers or provides terminal services or facilities for the comfort and convenience of interstate passengers, such as a public waiting room, rest room, or eating facilities," then the premises where these services and facilities are made available are part of the carrier's terminal facilities.

6. As used in this opinion and as used in the injunction order of this Court to be issued in this case, the term "terminal facilities" is to be and is defined as set out on page 3 of the order of the Interstate Commerce Commission issued September 22, 1961.

■■ If the existing policy and practice of affording separate facilities according to race is either enforced or authorized by state law or by any other form of state action, then the policy not only offends the provisions of the Motor Carriers Act, but also violates the Fourteenth Amendment. Browder v. Gayle, D.C., 142 F.Supp. 707, affirmed, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114; Baldwin v. Morgan, 287 F.2d 750 (5th Cir., 1961); Boman v. Birmingham Transit Co., 280 F.2d 531 (5th Cir., 1960). The evidence here establishes such state action. Although the plaintiffs do not attack the constitutionality of any specific state statute and although the arrests of which they complain were not specifically for violation of a "segregation" law, it is clear that the policy, practice, custom and usage which the carriers are following is an official policy, practice, custom and usage of the State of Alabama. The state has long had on its statute books a law requiring segregation of the races in bus and rail terminals. 48 Ala.Code, §§ 301(31a), 301(31b), 301(31c).[7] The defendant Alabama Public Service Commission on February 8, 1956, issued General Order No. T-21 requiring that signs reading "colored waiting room" and "white waiting room" be posted at the entrances of the separate facilities maintained at passenger stations and depots. This order has never been rescinded. Furthermore, on April 19, 1961, after the decision of the Court of Appeals for the Fifth Circuit in Baldwin v. Morgan, supra, the Public Service Commission issued an order modifying General Order No. T-21, but only to the extent that it should not apply to the facilities of the Birmingham Terminal Company in Birmingham which were the subject of the Court's order in the Baldwin case. The conclusion is inescapable that the policy of racial segregation in bus terminals in Alabama is the official policy of the state and that motor carriers, in providing separate facilities, are carrying out and implementing that official policy. This they are prohibited from doing by the terms of the Fourteenth Amendment. See particularly Baldwin v. Morgan, supra.

■ Not only does state-imposed segregation of bus passengers violate the Fourteenth Amendment, but, insofar as such segregation bears upon interstate travelers, it also offends the "commerce clause" of the Constitution (Art. 1, Sec. 8). Morgan v. Commonwealth of Virginia, 328 U.S. 373, 66 S.Ct. 1050, 90 L.Ed. 1317. As the Supreme Court pointed out in Morgan, a state effort to regulate seating arrangements of interstate passengers upon the basis of their race contravenes the need for national uniformity in the regulation of interstate travel. Accordingly, any attempt at such regulation violates the Constitution's provision that power over interstate commerce resides with the Federal Government. See also Whiteside v. Southern Bus Lines, 6 Cir., 177 F.2d 949; Williams v. Carolina Coach Co., D.C., 111 F. Supp. 329, affirmed 4 Cir., 207 F.2d 408.

■ The Attorney General of Alabama is designated by the laws of the State of Alabama as the legal adviser of the Public Service Commission (55 Ala. Code, § 228). The evidence shows that during the period pertinent to this case the Attorney General placed one or more of his assistants at the disposal of the Public Service Commission and that an assistant attorney general prepared for the Commission the letter in 1956 which directed the carriers to enforce segregation. The Court must conclude, therefore, that the actions of the Commission in this field of its operation have been taken with the advice of the Attorney General.

Furthermore, although the Attorney General of Alabama has been aware of the fact that passengers on interstate buses were entitled to use bus terminal facilities in Montgomery on a nonsegregated basis, he has never considered it

---

7. This statute, in the context of public bus transportation within the City of Montgomery, was declared unconstitutional in Browder v. Gayle, D.C., 142 F.Supp. 707.

his duty to advise local prosecutors or local law enforcement officers of that fact. To the contrary, when an attempt was made in Alabama to test the effectiveness of the federal law, the Attorney General responded by petitioning a state court for an injunction prohibiting the "freedom riders" and all persons having notice of the injunction from testing segregation practices in interstate bus facilities in Alabama.

Although the Attorney General of Alabama protests that his purpose was to preserve the peace, safety and tranquility of the people of the State of Alabama, the Court finds that one of his primary purposes was to enforce segregation contrary to the federal law, a law he was duty bound to uphold.

The arrests which are the subject of the intervenors' claim were the result, in part at least, of emergency conditions which this Court believes are unlikely to occur again. In this connection, the evidence relating to Sheriff Butler's participation in the arrests indicates that he acted only under the specific direction of the National Guard Commander. Montgomery is no longer under limited martial law. There is nothing in the record to indicate that Sheriff Butler will make arrests to enforce segregation in the future. No injunction will issue against him.

The City Board of Commissioners, although it had no specific jurisdiction under state law to regulate motor carriers, has used its fire and police departments to maintain segregation in the terminal facilities. For example, on May 15, 1961 —the day the "freedom riders" were first expected in Montgomery—the restaurant facilities in both bus terminals were closed by the Montgomery fire inspector. The closing of the restaurants was not justified; the violations noted in the inspection reports were trivial; no action was taken on them when they were first noted (May 10th and 11th), and the proprietor was given no advance notice or opportunity for administrative appeal.[8]

Further evidence as to the actions of the City Commissioners on May 21 concerns the treatment of two Atlanta Negroes who came to Montgomery by bus. While using the pay telephone in the white waiting room, they were told by a city policeman to move to the colored waiting room. When they did not move, they were arrested and taken to the jail in a police car on the ground that they had disobeyed an officer. At the jail they were fingerprinted, photographed and— forty-five minutes later—released. Although the city police maintain that this was done to protect the two Negroes from the mob, the Court finds that it was done to maintain segregation in the bus terminal.

Based upon the foregoing, this Court concludes that the plaintiffs are entitled to relief against those of the defendant state and local officials who have the authority to implement the state policy of segregation and/or those officials who have been in fact implementing the state policy of segregation. This includes first the Alabama Public Service Commission and its members.

The Attorney General of Alabama will be enjoined from taking steps to enforce the injunction issued in the Montgomery Circuit Court, or enforcing directly or indirectly segregation in buses or bus terminal facilities within the Middle District of Alabama.

An injunction will also issue against the Board of Commissioners of the City of Montgomery, their agents and employees, and the Chief of Police of Mont-

8. Letters were written to the restaurant operators at the two bus terminals directing them to close their restaurants immediately. The dates on the carbon copies, May 15, 1961, appear to have been inserted by using a different typewriter. This, together with the coincidence of closing both terminals for fire regulation deficiencies on the same day— which day was the first expected date of arrival of the "freedom riders"—compels the Court to conclude that the terminals were closed to prevent their use by the "freedom riders" on a nonsegregated basis.

gomery, his agents and employees, enjoining them from enforcing segregation and in particular from using fire safety regulations, breach of the peace, disorderly conduct or other statutes for the purpose of enforcing segregation against persons who, under ordinary circumstances, conduct themselves in an orderly and peaceful manner in any area, section or part of any terminal utilized by the bus carriers.[9]

---

9. That part of the action seeking relief against the state court's proceedings in the criminal cases has already been denied by separate action of this Court.